UNITED STATES of America,
Plaintiff,

v.

COLUMBIA PICTURES CORPORATION,
Screen Gems, Incorporated and Universal Pictures Company, Incorporated,
Defendants.

United States District Court
S. D. New York.

June 29, 1960.

See also 25 F.R.D. 497.

John Sirignano, Jr., Edward J. Harrison, and John M. O'Donnell, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Schwartz & Frohlich, Arthur H. Schwartz, Irving Moross, and Stuart G. Schwartz, Davis, Polk, Wardwell, Sunderland & Kiendl, Theodore Kiendl, Taggart Whipple, Henry L. King, Richard H. Pershan, and Roland W. Donnem, New York City, for defendants Columbia Pictures Corp. and Screen Gems, Inc.

Daniel Glass, New York City, Gen. Counsel, for Screen Gems, Inc.

Adolph Schimel and Harold Lasser, New York City, for Universal Pictures Co., Inc.

HERLANDS, District Judge.

*General Nature of the Action*

This is a civil antitrust action instituted by a complaint filed by the United States on April 10, 1958, under Section 4 of the Sherman Act (15 U.S.C.A. § 4) and Section 15 of the Clayton Act (15 U.S.C.A. § 25). It alleges violations of Section 1 of the Sherman Act (15 U.S.C.A. § 1) and Section 7 of the Clayton Act (15 U.S.C.A. § 18). The three defendants are Columbia Pictures Corporation ("Columbia"), Screen Gems, Inc. ("Screen Gems"), and Universal Pictures Company, Inc. ("Universal").

The complaint alleges that the violations arise from the execution and subsequent performance of two interrelated agreements: an agreement entered into August 2, 1957, under which Screen Gems, a wholly-owned subsidiary of Columbia, was granted for approximately fourteen years by Universal the exclusive license to distribute for television exhibition approximately six hundred Universal feature films originally produced prior to August 1, 1948 for theatrical, exhibition; and an agreement, executed concurrently by the three defendants, under which Columbia guaranteed performance by Screen Gems of all its obligations under the distribution agreement, and that Screen Gems would continue to be the exclusive licensee for television exhibition of substantially all Columbia pre-August 1, 1948 feature films.

Under the distribution agreement, Screen Gems undertook television distribution of the Universal feature films. Screen Gems was to receive certain specified percentages of the total income from such distribution, and guaranteed payment to Universal of annual minimums totaling $20,000,000 during the first seven years.

The Government alleges that the agreements themselves are agreements to fix prices, illegal *per se* under Section 1 of the Sherman Act. It also alleges that, in the distribution since August 2, 1957 of the Universal and Columbia feature films by Screen Gems, prices were fixed and competition eliminated between Universal and Columbia *per se* in violation of Section 1 of the Sherman Act.

The Government further alleges that the exclusive distribution rights received by Screen Gems constituted the acquisition of an asset within the meaning of Section 7 of the Clayton Act, the effect of which may be substantially to lessen competition in the distribution of feature films for television exhibition in New York City and the contiguous area known as Metropolitan New York.

*The Parties—Defendant and Jurisdiction*

Defendant Columbia is a corporation organized and existing under the laws of the State of New York, and transacts business and is found within the Southern District of New York. Columbia is in the business of producing motion pictures for theatrical exhibition which are distributed for such exhibition throughout the United States by subsidiaries and licensees.

Defendant Screen Gems is a corporation organized and existing under the laws of the State of California, and transacts business and is found within the Southern District of New York. Screen Gems is a wholly-owned subsidiary of Columbia, and is in the business of producing and distributing films for television exhibition. Many of the films which it distributes for television exhibition were produced by other companies; and some of these films produced by other

firms were produced originally for exhibition in motion pictures theatres.

Defendant Universal is a corporation organized and existing under the laws of the State of Delaware, and transacts business and is found within the Southern District of New York. Universal has, since 1912, been a producer and distributor of motion pictures for theatrical exhibition throughout the United States and the world. During those forty-eight years it has produced and distributed several thousand feature films by subsidiaries and licensees. The principal business of Universal has, for more than forty years, been the production and distribution of motion pictures for theatrical exhibition.

Each defendant is engaged in interstate commerce. There is no issue as to jurisdiction and venue.

## Definitions

The following definitions are based on the record:

(a) "Columbia": Columbia Pictures Corporation.

(b) "Screen Gems": Screen Gems, Inc.

(c) "Universal": Universal Pictures Company, Inc.

(d) "Distribution": Offering to grant and sublicense, and entering into contracts granting and sublicensing, the right to televise any filmed, videotaped or live programming to (1) any person operating any television station or group of television stations, for televising over such station or group, (2) any sponsor sponsoring any telecast over any television station or (3) any advertising agency, for exercise on behalf of any client sponsoring telecast over any television station.

(e) "Release": Advising or making known to prospective sublicensees that filmed, taped or live programming is in distribution.

(f) "Feature Film": A full length, copyrighted motion picture having a running time usually in excess of 60 minutes, originally produced for exhibition in motion picture theatres, including Westerns.

(g) "Package": Two or more feature films offered by a distributor for sublicensing to a sublicensee.

(h) "The Agreement": The Television License and Distribution Agreement executed by Columbia, Screen Gems and Universal on August 2, 1957, as of July 1, 1957.

(i) "Sale", "License" or "Sublicense": The transaction by which a distributor transmits to a television station the right to exhibit television programming.

(j) "D————": Exhibit ———— submitted by defendants Columbia and Screen Gems.

(k) "G————": Exhibit ———— submitted by plaintiff.

(l) "U————": Exhibit ———— submitted by defendant Universal.

## Prior Proceedings

The complaint was filed April 10, 1958, more than eight months after the Distribution Agreement was executed. Six months later, in October 1958, the Government moved to enjoin the continued performance by the defendants of the August 2, 1957 Agreements, and for summary judgment as to the Section 1 charge.

On November 3, 1958, defendants amended certain language of the Distribution Agreement which the Government had cited in its moving papers as proof of the per se illegality of the agreement.

On January 22, 1959, the motion for summary judgment was denied. The motion for preliminary injunction was partially granted, the defendants being enjoined from releasing more than fifty Universal feature films in any six-month period during the pendency of the litigation. *United States v. Columbia Pictures Corporation*, D.C.S.D.N.Y.1959, 169 F.Supp. 888.

## Pretrial Proceedings

Following these motions comprehensive pretrial proceedings took place. The parties propounded interrogatories upon

each other and served answers thereto. Plaintiff took the deposition of one of the officers of Screen Gems.

Formal and informal pretrial hearings were held before the Court, during which proposed exhibits and the issues and contentions of the parties were thoroughly explored among counsel and the Court. This resulted in the entry of a Pretrial Order on March 14, 1960, consented to by all parties, which embodied a number of stipulations of fact, cleared many objections to exhibits, and resulted in expediting the trial considerably.

### Some Aspects of the Trial Proceedings

The trial, which commenced March 14, 1960, lasted 17 court days and covered more than 2,600 pages of transcript. Upwards of 250 exhibits were admitted into evidence. The Government called three witnesses in its case in chief and one rebuttal witness. Defendants Columbia and Screen Gems called eight witnesses. Defendant Universal called five witnesses. Of the foregoing thirteen defense witnesses, the testimony of five (Schneider, president of Columbia and Screen Gems; Rackmil, president of Universal, and Miles, Theuteberg and O'Neill of Universal) were stipulated to by the Government.

Several motions were made during the course of trial. Defendants' motion to dismiss at the end of plaintiff's case was denied.

Plaintiff's motion at the end of its case for an order extending the partial preliminary injunction against Screen Gems releasing further Universal films was also denied, as was plaintiff's renewed motion for the same relief made later during the course of trial.

The Court reserved decision on all motions at the conclusion of the evidence, and directed that the parties exchange and file proposed findings of fact and conclusions of law, and main and reply briefs.

### The Statutes Involved

The statutes involved herein are, in relevant part, as follows:

Section 1 of the Sherman Act: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *." 15 U.S.C.A. § 1.

Section 7 of the Clayton Act: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, * * *" 15 U.S.C.A. § 18.

### The Distribution Agreement

The Distribution Agreement was admitted into evidence as Government's Exhibit G1. It was, as stated, executed by defendants August 2, 1957. Its essential terms are substantially as follows: Universal granted to Screen Gems exclusive television distributorship of the approximately 600 feature films produced and released for theatrical exhibition by Universal prior to August 1, 1948 (with limited exceptions not material). The distributorship is for a period of up to 14 years and is not assignable. Universal granted only the right to distribute the films for television exhibition; Universal reserved all other rights in the films and continues to own them (Sections III, VII of Distribution Agreement).

In addition, the Distribution Agreement required Screen Gems to distribute the features diligently in order that the greatest possible revenues may be realized for itself and Universal (Section V). Screen Gems was required to release not less than 78 Universal features in each of the six annual periods (Section V.6) and to negotiate to sublicensees

concerning the Universal features on a non-discriminatory basis (Section V). After Screen Gems recoups certain distribution expenses, it is to be paid a percentage of the net proceeds as its distribution fee; Universal is entitled to the balance (Sections X.7, X.8). Screen Gems is required to make annual minimum payments to Universal which total $20,000,000 over seven years (Section X).

The Agreement provided that all sales and other policies relating to Universal pictures and their distribution should be formulated jointly by Screen Gems and Universal (Section V.3); that Screen Gems would not grant any sublicense for Universal's pictures on terms less favorable than for Columbia's (Section V.7); and that Screen Gems would submit to Universal, in advance of the release of any Universal features, a schedule of minimum prices below which Screen Gems was not to sublicense the Universal features without Universal's approval (Section V.7).

The Agreement permits Universal to conduct an audit of Screen Gems' sales records (Section XI) and requires Screen Gems to render reports to Universal showing the sublicensing of each Universal film and the sublicensing of other films included in transactions involving Universal films (Section XII).

The Agreement also provided that the revenues resulting from a sublicense which includes both Universal features and Columbia features shall be allocated to Universal and to Screen Gems on the basis of the value assigned by those defendants to each of the features included in the sublicense (Sections V, X). To effectuate this purpose, in those cases where a package of feature films is composed of Columbia features and Universal features, Universal and Screen Gems agree on the proportion of revenues attributable to each company on the basis of the relative value of the features each has contributed to the package. The allocation proportion is achieved by assigning to each feature in the package a classification, either "A", "B", "C" or "D", according to its relative value (Section V.14).

The Distribution Agreement was amended by the parties on November 3, 1958 in certain respects directly pertinent to the issues raised under the Sherman Act. The amendments will be discussed below in that connection.

### The Sherman Act Section 1 Charge
*The Issues Stated*

Both sides see eye to eye on the propositions that an agreement to fix prices is illegal per se; and that, where the attacked arrangement is one to fix prices, the trial court must reject as immaterial and irrelevant defendants' proffered evidence of their intent, motive and good faith in entering into the agreement or of the beneficial economic effect of the agreement.

The parties are, however, in fundamental disagreement as to whether the contract herein is an agreement to fix prices, either by its terms or by its operation. In essence, the plaintiff's position is that the agreement on its face is one to fix prices; that extrinsic evidence of the genesis and economic motivation of the agreement is therefore immaterial; and that the actual operation of the contract is corroborative of its price-fixing character. Consequently, the plaintiff's strategy has been to present and rely on an almost exclusively documentary case; and its tactic has been to emphasize the wording of certain clauses in the agreement and the plaintiff's conception of how these clauses operated in practice.

Taking sharp issue with each of plaintiff's contentions, defendants have argued that a mere reading of the agreement would not enable the court to reach a definitive conclusion, either in point of fact or as a matter of law, as to whether the contract is one to fix prices. On the contrary, defendants assert, a finding and conclusion as to whether or not this agreement is a price-fixing device can be formulated only on the basis of a realistic view in depth of the agreement —its origin, motivation, objectives, wording (as the various clauses were negoti-

ated, drafted and finalized), and its actual operation and effect. Such evidence, the defendants say, is offered—not to legitimatize an agreement to fix prices—but to demonstrate that, viewed in the totality of the facts, the agreement has none of the characteristics of an agreement to fix prices, as that term is conventionally used.

These rival contentions were put forward and argued at length during the extensive informal and formal pre-trial conferences and hearings, as well as in pre-trial legal memoranda submitted by both sides. The court, having considered the legal arguments and having read the proposed exhibits and heard summaries of the proffered proof, decided that the defendants should be permitted to present a full case in accordance with the rationale of their analysis. In the course of the trial, the defendants did make a comprehensive presentation through live witnesses, stipulated testimony, and extensive documentary proof.

A restatement of the Sherman Act, § 1 issues and a brief outline of the Clayton Act, § 7 issues will facilitate a consideration of the trial record.

*Sherman Act, § 1.* The Government alleges that defendants entered into an unlawful combination and conspiracy consisting of a "continuing agreement, understanding and concert of action by the defendants" (par. 19). It is alleged that the "defendants have effectuated the aforesaid combination and conspiracy in part by means of" the Distribution Agreement (par. 20). Plaintiff charges that the "effects" of the classification provisions of the Distribution Agreement and of the "less favorable" treatment clause "have been and unless restrained will be to fix and maintain uniform and identical minimum prices and to eliminate price and other competition between Columbia, Screen Gems and Universal, in the distribution and licensing of feature film for television exhibition throughout the United States" (par. 24).

The Government has urged from the outset that the foregoing alleged conspiracy and combination is illegal per se under Sherman Act, § 1. The Government has, with deliberation and persistence, set forth its contention that it need prove its case solely by reference to the four corners of the Distribution Agreement, without reference to the extrinsic facts.

Consistent with this claim, the Government stipulated in Pretrial Order Par. 13(n) that "In connection with the Sherman Act Section 1 cause of action and the allegations in the complaint relating thereto, the Government is not relying upon any oral understanding or parol agreement between Columbia, Screen Gems or Universal extrinsic to the written agreement of August 2, 1957." And further, the Government stipulated in Par. 13(o) of the Pretrial Order that "The agreement of August 2, 1957 was the result of arm's length bargaining between the parties, and the parties in entering into said agreement did not have the motive to fix prices within the meaning of Section 1 of the Sherman Act."

It is thus clear that the broad issue in the Sherman Act charge in this case is whether, in the face of the fact that the parties did not have the motive, purpose or intent to fix prices, and without proof by plaintiff of any effect of the Distribution Agreement in the market place, the Court can hold the Distribution Agreement to be illegal on its face as a price-fixing arrangement such as is condemned *per se* by the Sherman Act.

To bring this issue into sharper focus, defendants have not asserted that "price-fixing" arrangements, once found, are not illegal *per se*. In defendants' submission, the issue before this Court was to determine what constitutes price fixing under the decisional authorities.

The Government is *not* claiming that the fact that Columbia and Universal are distributing through the agency of Screen Gems in mixed packages constitutes by itself an illegal *per se* arrangement.

As was stated in the record (2605–06):

"The Court: Now let me see in the interest of saving time whether

I cannot formulate the second issue.

"The government claims that by virtue of the fact that Columbia and Universal got together through the medium of Screen Gems, and sold through Screen Gems feature films of each, either alone or in mixed packages, that the effect of that was necessarily to eliminate competition between Universal and Columbia in regard to feature films to be used as programming material on TV stations.

"*Do you claim that?*

"Mr. Harrison: *No, your honor.*

"The Court: All right, you tell me what you claim.

"Mr. Harrison: *We claim that not merely the fact that they got together—that per se we do not claim is illegal,* but we say that the arrangement by which they got together, that is, the specific provisions of the agreement whereby they determined in advance a formula—they determined in advance how much would be received for each Universal and each Columbia feature film in relation to each other, and they entered into the proviso of Section V.7 where no Universal feature film shall be sold for less than a Columbia feature film, that that was the per se illegality." (Emphasis added.)

The Sherman Act issues thus resolve themselves into two contentions, as articulated by Government counsel (2610–14):

1. Does the proviso of Section V.7 of the Distribution Agreement, relating to the "less favorable" treatment of Universal features, and the implementing sections, relating to minimum rate schedules, constitute price fixing illegal *per se*? As to this issue, the Government contends that it is immaterial and irrelevant as to how the contract was carried out and performed, that the issue must be decided by looking only to the language of the contract and nothing else, and that the contract provisions are self-explanatory, self-illuminating and self-defining, requiring no explanation as to what was intended, how the parties operated and the practical purposes sought to be served.

2. Do the classification provisions of the Distribution Agreement constitute price fixing illegal *per se*? In this connection, the Government asserts that the Court must go beyond the four corners of the Agreement and "must analyze their operations".

As to (1), it is defendants' position that the provisions of Section V.7 of the Distribution Agreement, and related provisions, do not call for price fixing on their face and have not operated as such. Moreover, this very section of the contract was completely eliminated by the amendment of November 3, 1958, as was the provision for the submission to Universal of minimum rate schedules. Defendants have made it manifestly clear that they do not intend to revert in any way to these provisions. Thus, the very provisions upon which the Government rests its contention of illegality have already been carved out of the Agreement. Despite the amendment, the Court will adjudicate the legality of the agreement both prior and subsequent to November, 1958.

As to (2), defendants submit that classification did not operate to fix prices at which Columbia and Universal feature films were licensed or sublicensed to television stations, and that these provisions were inserted in the Agreement solely as an internal procedure to facilitate allocation of the proceeds of licenses and sublicenses between Columbia and Universal on the basis of the relative value each contributed to the package of films sold.

Defendants pose a third issue: whether the clauses objected to by the Government, even assuming *arguendo* that they are anticompetitive in effect, are ancillary to the main, concededly legitimate, transaction of Screen Gems distributing Universal features and, as such, whether their validity under the cases must be

determined by their reasonableness under all the circumstances.

*Clayton Act,* § *7.* The issues under the Clayton Act may be defined as follows:

(1) Whether Screen Gems acquired an asset within the meaning of Sec. 7 when it obtained an exclusive limited license under a copyright to distribute Universal feature films for television exhibition.

(2) What is the appropriate "line of commerce." The Government contends that feature films for television exhibition have sufficiently peculiar characteristics and uses to constitute them an appropriate line of commerce within which the probable future effects of the acquisition may be evaluated.

Defendants submit that feature films do not have such sufficiently peculiar characteristics and uses, and that the appropriate line of commerce is broader than feature films and includes other films and television programs.

(3) Whether, as the Government claims, the New York metropolitan area is an appropriate "section of the country" within the meaning of Sec. 7 of the Clayton Act. Defendants submit that plaintiff has failed in its burden of proof in establishing that the New York metropolitan area is an area of effective competition, by itself significant and distinguishable from other parts of the country.

(4) The fourth and final issue under the Clayton Act charge is reached only if the Government prevails on each and every one of the foregoing three issues. If the issue is reached, the question is whether the effect of the acquisition by Screen Gems of the license for television distribution of the Universal feature films may be substantially to lessen competition in the distribution of feature films for television exhibition in the New York television market.

The Government acknowledges that it has the burden of proof on all issues in the case, Clayton Act as well as Sherman Act. This means, under the Clayton Act, that if the Government has failed to sustain its burden of proving by a fair pre-ponderance of the credible evidence *any one* of the four contentions enumerated above, defendants are entitled to judgment dismissing that charge.

## Description of the Television Industry

The television industry in the United States is relatively new. Illustrative statistics show the tremendous expansion and growth within the ten-year period 1949 to 1958: in 1949 there were but 98 commercial television stations in the United States, whereas ten years later there were 514.

The number of total TV sets in the country grew in the ten-year period from 1,000,000 to 47,000,000, while at the same time the number of television homes expanded from 940,000 to 41,924,000.

Concurrently, television broadcasting revenues and expenses and volume of television advertising grew with dynamic leaps and strides.

In New York City there are seven commercial television stations: Channel 2 (WCBS-TV), Channel 4 (WRCA-TV), Channel 5 (WNEW-TV), Channel 7 (WABC-TV), Channel 9 (WOR-TV), Channel 11 (WPIX) and Channel 13 (WNTA-TV). WCBS-TV is affiliated with the CBS network, WRCA-TV is affiliated with the NBC network and WABC-TV is affiliated with the ABC network. The other four stations presently have no network affiliation.

The physical picture projected by the seven New York stations on television sets in the homes in the New York area extends beyond the confines of the city itself. Each of the seven stations has its transmitter site on the Empire State Building in New York City, and the power to transmit an image extends to a radius of approximately 75–90 miles from the Empire State Building.

Television stations throughout the country are on the air for a major portion of the day, every day of the week. While the sign-on and sign-off times vary from station to station, and even for the same station from month to month and year to year, it can be said generally that stations are exhibiting programming ma-

terial from early morning to late evening. This is particularly so in New York, although there is no substantial difference in the programming technique and practice by television stations located outside of New York from those located in New York.

Television programming consists of programs produced on motion picture film, programs presented live on stage and, of more recent development, programs recorded on Videotape, a new development in the industry which permits instantaneous reproduction of sight and sound on magnetic tape, which can be played over and over again as in the case of programs produced on film.

Film programs consist of those motion picture films produced specifically for television and those produced originally for theatres but which have been made available for television exhibition. Feature films fall within the latter category.

The following basic fact must be emphasized at the outset. Only pre-August 1, 1948 feature films are involved in the Government's charges. For purposes of this case, pre-August 1, 1948 feature films are generally referred to as "feature films" (without a date) or, sometimes, as "pre-1948 feature films."

The dividing date-line between "pre" and "post" August 1, 1948, comes about as a result of a labor union controversy in the movie and TV industries. Script writers, performers, and others (directors, cameramen, stagehands) want a "cut" of the revenues from the TV exhibition of feature films produced after August 1, 1948. No similar claim has interfered with the TV licensing of pre-August 1, 1948 feature films.[1]

Consequently, pre-August 1, 1948 feature films have thus far been available for TV exhibition, while post-August 1, 1948 feature films have not been released for that use. When the labor controversy is settled (and this is imminent) post-August 1, 1948 feature films will be sold or licensed for TV exhibition, and thus compete with pre-August 1, 1948 feature films.

"Pre-1948 feature films" are a product of finite quantity. There is a fixed inventory of that product. It cannot be replenished. Moreover, it is a continuously depleting property in the sense that, with each repeat or rerun, its economic value approaches zero.

In sharp contrast, the quantity of post-August 1, 1948 feature films has an "open end;" there is no limit on their number. The significance of post-1948 feature films is coaxial—quantity plus quality. Qualitatively, post-August 1, 1948 feature films have much greater value than pre-August 1, 1948 feature films, because the established stars are better known to present-day audiences, and the technological production is improved. Moreover, in theme, character portrayal, and costuming, post-1948 feature filmes are closer to current taste and contemporary trends, and thus have enhanced audience identification and audience appeal.

The same qualitative and quantitative comparison is to be made between pre-1948 feature films and current live TV shows, taped recordings of such live shows (i. e. videotapes) and syndicated films (i. e. films that are made specially for TV exhibition). Live shows, taped live shows, and syndicated films—like post-August 1, 1948 feature films—are types of TV programming material that do not have a fixed inventory limitation. They, too, are keyed to current tastes, thereby facilitating commercial exploitation of the vogue.

Economic realities thus compel an appraisal of pre-1948 feature films in a market context that includes domestic and foreign post-1948 feature films, live shows, video-taped live shows, and syndicated films.

For all practical purposes, TV programming is an adjunct of the advertising business. The end: maximum view-

---

[1]. TV licensing of pre-1948 films does not produce an income ("residuals") to the original writers, except in occasional cases where they owned a share of the picture.

ing audience and, consequently, maximum purchasers. The means: TV programs.

TV programming is a mixture of show business and advertising. It is a form of economic symbiosis.

The TV stations are interested in advertising revenue. The TV industry is subject to the pressure for higher ratings and higher profits.

TV programming is dynamic, experimental, free from fixed patterns, subject to the requirements of advertisers and sponsors, and catering to the advertising experts' image of the largest common denominator of public taste. Variety is the spice and therefore the necessity of TV programming. A partial cataloguing of the varieties of TV programming demonstrates that it covers a broad spectrum, the elements of which include such items (to use the cant of the trade) as "Westerns," "adventure tales," "suspense drama series," "private eyes," "Civil War action series and Civil War specials," "hilarious comedy," "humor," "song, dance and comedy specials," "Shakespeare," "television biography" (intimate closeups of famous personalities), "news specials," "opera," "contest," "quiz shows," "sports events," "wisdom," and "religion."

TV is a prime advertising medium because the audience for programs can be turned into a market for advertised wares. The sponsor pays for a program, not primarily to entertain viewers, but to get them to listen to his advertising messages, the commercials, which persuade them to buy his product. The commercial may be one or more long or short announcements in the course of an extended network program or a ten-second plug on a local station.

A sponsor has a good deal to say about the quality, the content and the general character of a program he pays for. To get a program, he turns to his advertising agency.

The advertising agency is a considerable power in TV. The money that pays for programs funnels through the advertising agency, which picks a program for a sponsor, fits it with commercials to sell the sponsor's products, and buys broadcasting time from a TV network or station.

Sometimes agencies actually produce a show for a sponsor. But more and more the advertising agencies turn for programming material to the TV distributors.

The distributor or packager may be an independent producer who puts a complete show together, sometimes from opening music to closing commercial. Packagers or distributors will either produce a complete live show or, more usually, a film series which will run a number of episodes or license feature films.

The networks are largely middlemen, taking programs from sponsors and transmitting them over cable lines to local stations, which pass them on to the viewers. The cable wire and related facilities, loosely hold together the network's wholly-owned stations, plus independently-owned affiliates, with which the network contracts to furnish a certain number of programs.

The reality of TV is an ever-fluctuating relationship between three economic powers:

(1) representatives of the networks and independent stations,

(2) sponsors and their advertising agencies, and

(3) packagers and distributors of TV programming materials.

As broadcasting hours stretched out from pre-dawn to past midnight, the TV stations turned to outside program packagers and distributors for programming material to fill up the schedule.

The content of TV programs is influenced by the real or suspected views of the TV audience. The TV industry tries to give the viewers what they want. It tries to find out what they want through the rating systems. The ratings are meant to establish how many people actually see TV shows. There are three major rating services, and they use dif-

ferent ways to poll viewers. Trendex bases its results on 1,000 telephone calls made at random to possible TV viewers in 25 cities. Nielsen attaches meters to 1,200 TV sets; and these keep a record of how much and when the sets are used. Arbitron, using another set attachment, keeps a continuous electronic check on the set and beams its findings to a computer.

The main task of a TV program is to get the highest possible number of viewers for the sponsor, thereby achieving the highest possible profits. At present, television does not sell its product, i. e., entertainment. It exists only to sell other wares.

To recapitulate, programming viewed on American television results from the intermeshing of a number of entities, the chief of which are advertisers and advertising agencies, television networks, commercial television stations, producers and distributors of programming, station representatives, and the common carrier providing interconnection.

There are three television networks in the United States: Columbia Broadcasting System (CBS), National Broadcasting Company (NBC) and American Broadcasting Company (ABC). Each of the networks owns and operates television stations in cities throughout the country, including New York, as follows:

| Network | Stations | Location Covered |
|---|---|---|
| ABC | WABC–TV | New York |
| | WBKB | Chicago |
| | WXYZ–TV | Detroit |
| | KABC–TV | Los Angeles |
| | KGO–TV | San Francisco |
| CBS | WCBS–TV | New York |
| | WBBM–TV | Chicago |
| | KNXT | Los Angeles |
| | WCAU–TV | Philadelphia |
| | WXIX | Milwaukee |
| | WHCT | Hartford |
| | KMOX–TV | St. Louis |
| NBC | WRCA–TV | New York |
| | WNBC | Hartford |
| | WRC–TV | Washington, D. C. |
| | WNBQ | Chicago |
| | WRCV–TV | Philadelphia |
| | KRCA | Los Angeles |

Many of the more than 500 commercial television stations throughout the United States are affiliated by contract with one or more of the three television networks.

Programs created originally for television viewing are produced by networks, stations, advertising agencies and independent producers.

Television programming is supplied to stations by networks, independent distributors, advertisers and the stations themselves. Distributors of filmed programming (made originally for television or for motion picture theatres) and videotaped programming sublicense their programming to stations, advertisers and networks.

While programming may be paid for or produced in the first instance by stations, it is advertisers who in the final

analysis bear its cost. Networks act as selling agents for the stations which they own and operate and with which they are affiliated in selling advertising time on the stations. Stations also employ other sales agents, called station representatives, to sell their commercial time to advertisers.

Networks arrange with American Telephone & Telegraph Company, the common carrier for interconnection, to deliver network programming to their owned and operated stations and to the affiliated stations.

*The Distribution Agreement Is Not an Arrangement to Fix Prices*

■ An agreement to fix prices is illegal *per se*, without regard to motive, market control, or the amount of commerce affected. United States v. McKesson & Robbins, Inc., 1956, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209; United States v. Line Material Co., 1948, 333 U. S. 287, 68 S.Ct. 550, 92 L.Ed. 701; United States v. Paramount Pictures Corp., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L. Ed. 1461; United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; Virginia Excelsior Mills Inc. v. Federal Trade Commission, 4 Cir., 1958, 256 F.2d 538.

But the facts adduced at the trial do not bear out the plaintiff's allegation that the distribution agreement is an arrangement to fix prices. Appalachian Coals v. United States, 1933, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L. Ed. 926, ("Cracking" case); Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683; United States v. Morgan, D.C.S.D.N.Y. 1953, 118 F.Supp. 621, 689, 691 ("Investment bankers" case).

The evidence has been tested and measured against the criteria established by the foregoing authorities.

The evidence establishes the total lack of purpose, intent or motive to fix prices.

Concededly defendants did not have the motive to fix prices. As the Government stipulated in Pretrial Order 13(o):

"The agreement of August 2, 1957 was the result of arm's length bargaining between the parties, and the parties in entering into said agreement did not have the motive to fix prices within the meaning of Section I of the Sherman Act."

The record is equally conclusive that the parties entered into the arrangement for legitimate business purposes without intent to fix prices. During the course of trial the Government stipulated that, if called as witnesses, Abe Schneider, the president of Columbia and Screen Gems, and Milton Rackmil, the president of Universal, would testify to certain facts embodied in the stipulation. These were read into the record and stand uncontradicted and unimpeached in any way. Schneider testified (1371-2):

"In entering into the agreement of August 2, 1957, Government Exhibit G-1, neither Columbia Pictures nor Screen Gems intended to fix prices or to eliminate competition and the agreement of August 2, 1957 was not entered into for that purpose."

Similarly, Rackmil testified that Universal did not enter into "any agreement for an illegal purpose", and that the distribution agreement was executed "in the exercise of our best business judgment, for reasonable business requirements and for a lawful purpose" (1903).

The testimony of Schneider and Rackmil, and the corroborative testimony of other executives of the defendants, Hanft, Hyams and Gluck, establish the business reasons for the parties' entering into the distribution agreement.

From Universal's standpoint, it had prior to August 2, 1957, a library of pre-August 1, 1948 feature films which was considered by it to be of real value for television exhibition. As Rackmil and Gluck emphasized, although Universal

was in the business of distributing feature films to motion picture theatres, it had never been in the business of distributing feature films or any other form of programming to television stations, and it is not possible to utilize theatrical distribution facilities in the television field.

As Rackmil testified (1892-3):

"The distribution of motion pictures for television exhibition is a separate and distinct business from that of distributing motion pictures for theatrical purposes. * * * Distribution of motion pictures for television requires a separate and distinct sales and promotional organization. * * * The techniques of promotion, advertising, purchase and sale are entirely different. The same personnel has not been and cannot be employed interchangeably."

For that reason Universal was faced with the choice of establishing a new distribution organization for itself or licensing its library or feature films to an existing independent organization. Prior to any negotiations with Screen Gems, the Universal management made the decision not to enter the television distribution business; and from that point sought a responsible and competent firm through which it could realize the potential income from television exhibition of its feature films.

The evidence adduced at the trial establishes further that Universal received offers from and negotiated with a number of organizations which sought the distribution rights to the feature films. The choice finally narrowed down to Screen Gems.

Screen Gems had an experienced distribution organization in all forms of filmed television programming. It was set up to distribute nationally. It had the financial responsibility and backing, not only of its own resources, but also of its parent Columbia. Finally, Screen Gems was engaged in the so-called retail method of distributing films.

Universal had made the business determination prior to August 2, 1957 that because the quality of its feature film library was not as good as those of the rest of the motion picture industry, the most profitable method of distributing the films would be to release them to television stations around the country in small packages, rather than licensing the entire library at once. This required the facilities of a national organization experienced in the syndication of television material. Screen Gems not only fit the bill in this regard but had specific experience in the retailing of the feature film library of Columbia.

On its part Screen Gems sought the distribution rights to the Universal library in order to replace its dwindling supply of programming material.

Screen Gems had obtained the distribution rights to the Columbia library in February 1956. By mid-summer 1957, half of the Columbia films had already been released by Screen Gems; only about 190 salable Columbia features remained. Replenishment was necessary in order to maintain the overhead required to support a national distribution organization.

Hanft, vice president and treasurer of Screen Gems described the problem graphically (411-13):

"Basically, we need to acquire programs to keep our sales staff busy, and then after we acquire programs we need to get more sales. It is an interrelated process. The success of our company depends upon the acquisition of programs for distribution. Involved in that is a study of the marketplace and the needs that the television industry have for programming, so that acquisitions of programming would become intelligent acquisitions.

"We tried to obtain the information concerning the marketplace by a constant flow of reports from our sales staff, from trade journals, from personal knowledge gathered through meeting with various people in the industry.

"Based upon that information concerning the needs of the marketplace, we will then make efforts to acquire programming, such as the Burns and Allen films, some 239-odd programs, the Universal features, the Fireside programs.

"We do this because we have a fixed nut. We have an overhead. We have an operation to run, and the more film we can run through that operation the lower will be the cost of distribution on a percentage basis. That means that our profits will increase if we can reduce our cost of distribution.

"At the same time that means that we can support and maintain the relatively large independent organization that we have, and hopefully throw off some profits for the stockholders.

"In order to do this, again, after we have acquired programming, we now have to merchandise it, that is, show it. This means we have to package it. We have to offer it attractively. We have to advertise it. We have to put it into the marketplace so that people will spark to it and take an interest in it and want to buy it."

These were the motivating factors that brought the parties together in the summer of 1957.

The resulting distribution agreement, consisting of 57 carefully drawn pages, was entered into after hard bargaining on both sides and long and arduous negotiations over all of the details of the arrangements.

In the interest of a clear and complete record, the Court will now set forth a number of detailed findings and conclusions concerning the economic background of the parties, their business activities leading to the agreement, and the provisions and operation of the agreement:

1. Milton R. Rackmil assumed the presidency of Universal in 1952; has been its president since that date, and has been responsible for its business plans and policies.

2. United World Films, Inc. (hereinafter referred to as "United World") is a Delaware corporation, and all its stock is owned by Universal.

3. United World was organized in 1946. Since that time its principal business has been the distribution of 16 mm. films for non-theatrical purposes.

4. United World's activities in television consisted chiefly in supplying stock footage from its newsreel library to networks, advertisers and television producers which were assembling shows for television exhibition.

5. An insubstantial and minor portion of United World's business consisted of the offering of a small group of non-theatrical short subjects to existing television stations for exhibition thereon. These consisted of several series of 12½-minute subjects assembled from discontinued theatrical shorts, newsreel footage and library footage. They were titled "Stranger Than Fiction," "Sports Scholar", "Headlines on Parade" and "Going Places."

6. Beginning in or about 1948 United World produced spot commercials. These were advertising footages made for a particular sponsor, and having a running time of less than one minute. These were inserted in television programs by others and were used to advertise a product.

7. The production of spot commercials is a specialized single line phase of film production and is not programming for television or television distribution.

8. The spot commercial business of Universal accounted for the major proportion of Universal's television business.

9. Exhibit U–1 through U–8 are the official reports of Universal and were prepared from its books and records. They contain statements of policy of the company, and financial statements certified to by independent public auditors, Price, Waterhouse and Company and Peat, Marwick, Mitchell & Company.

10. For the fiscal year ending November 1, 1952, Universal's annual report contained the following statement:

"We are continuing to develop plans for the production of films for television. Although our program at this time is in an experimental stage it is our hope that this part of our business can be developed in the future."

11. Universal's annual reports for the period beginning November 2, 1952 and ending October 31, 1959 contain no reference to the production or distribution of material for television programming. Universal was not engaged in either the production or distribution of material for television programming.

12. In early 1952 a series of thirteen one-half-hour shows entitled "Fighting Man, U.S.A." was produced by Universal solely for television distribution. This series, produced at a cost of more than $250,000 proved a financial failure. After 1952, the sales policy of Universal did not include production, distribution or programming for television.

13. The Universal annual reports indicate the contract with Screen Gems is not carried as an asset by Universal. "A pro rata share of the annual minimum guaranty is to be taken into operations each monthly accounting period."

14. In 1955 and early 1956 Universal granted certain television rights to various distributors.

15. Universal licensed a group of ninety-seven specially made low-budget short-length Westerns to Victory Enterprises by agreement dated November 30, 1944. These were not part of Universal's library nor were they considered as such since they were a particular group of old, played-out, inferior Westerns.

16. These ninety-seven in their theatrical release were called program Westerns. They were not carried under the regular release schedules. At best, they would play the second half of a double bill at a small theatre; had a continuing star; were not considered part of the Universal library; and were carried in a category by themselves.

17. Eight pictures, referred to as the Mayfair Group, and in which others had a financial interest, were licensed to television distributors in 1956 when their parties in interest (other than Universal) were most adamant in getting additional revenue for these pictures from television.

18. This Mayfair Group was licensed to National Telefilm Associates, a distributor to television stations which was also, at that time, the exclusive distributor to television of the features of Twentieth Century-Fox.

19. Six other pictures in which Universal's basic rights were about to expire were also licensed to television distributors in 1956.

20. None of the foregoing transactions placed Universal in the business of licensing its features for television purposes. These transactions were special and *sui generis* and did not involve a significant change in the basic policy decision of Universal not to engage in the business of distributing its pre-1948 features for television exhibition or to engage in television programming.

21. The techniques of promotion, advertising, purchase and sale of film for exhibition in motion picture theatres is entirely different from that employed in the production and licensing of film for exhibition in television, or in television programming.

22. Since 1940 Universal has distributed hundreds of pictures which it had produced; it also distributed more than 175 pictures produced by others and entered into contracts for their distribution for exhibition in theatres.

23. In each such distribution contract involving a motion picture produced by another and distributed by Universal there is a clause which provides safeguards against discrimination which otherwise might favor Universal's own pictures against those in which outsiders had an interest.

24. In the distribution of film for motion pictures Universal has entered into contracts with independent producers in more than 175 instances and in all such contract arrangements the following clause (paraphrased) appears:

"12. You hereby grant us the sole and exclusive right to release, distribute, * * *. It is understood that we may distribute a large number of our own photoplays each year and that our subsidiaries or any other distributors selected by us may distribute a large number of their own photoplays each year * * *. We agree to use our best efforts in obtaining bookings for said photoplays at rentals consistent with the merit and box office appeal of the said photoplay. We agree in the exercise of our rights hereunder to exercise the same in good faith and with due diligence and we further agree that in the exercise of such rights we will treat said photoplay as favorably as we treat our own photoplays having the same merit and box office appeal as said photoplay."

Said contracts also include clauses substantially as follows:

"25. * * * We agree to keep for you true and accurate books of account pertaining to the distribution of said photoplay. Said books of account shall be open during reasonable business hours to your inspection and may be copied by you or public accountants or attorneys employed by you."

25. It was common practice in the motion picture business to provide that the distributor of an independently produced picture agree to treat that picture in a non-discriminatory fashion.

26. In its motion picture business Universal kept accounting sheets cumulatively indicating the weekly grosses of all pictures in distribution by Universal. The books containing the sheets are made available in every instance where a distribution contract is audited by the representatives of an independent producer or person having a financial interest in the proceeds realized by the picture.

27. In auditing the film rentals of any picture under the terms of any of the 175 distribution contracts, the auditor may compare rentals obtained for his picture with the rentals obtained for other pictures which Universal is distributing, including those in distribution before and after the picture then being audited.

28. The non-discrimination and audit provisions were carried over from motion picture custom and practice and were included in contracts when television rights were licensed.

29. Distribution of motion pictures for television is a separate and distinct business from that of distributing motion pictures for theatrical purposes.

30. Distribution of motion pictures for television exhibition requires a separate and distinct sales and promotional organization.

31. Universal never created or maintained an organization for the distribution of motion pictures for television exhibition, nor for television programming.

32. Most motion picture producers or owners do not use their own organization for distributing feature films to television. Twentieth Century-Fox does not; Warner Brothers and RKO do not; and Paramount does not.

33. The following important business considerations were involved in Universal's determination not to make its features available for television exhibition before the 1957 Screen Gems agreement: (a) The incalculable effect of such licensing on Universal's major activity, the production and distribution of feature films for theatrical exhibition; (b) The remake value of Universal pictures, and the possible revenue from their theatrical reissue; (c) The fluid and indeterminate state of the television market; (d) The revenue potential of Universal features if released at the same time as the features of other motion picture producers; (e) The impact of color and pay television; and (f) The release of post-1948 features.

34. Universal feature films which formed its pre-1948 library did not have the revenue potential of the feature films of Paramount, Fox, Warner and Loew's.

35. The pre-1948 libraries of Warner, RKO, Fox and Loew's were already in the television market, in whole or in part.

36. Universal pictures were for the most part, modest budget action, mystery, horror, family situation, comedy and musical films inexpensively made, and with stars, stories and other values. They were not as commercially desirable as the pictures of Warner, RKO, Fox, Loew's and Paramount.

37. It was the considered business judgment of Universal executives that, if its pre-1948 feature film library was to return a substantial revenue in an already highly competitive market, careful intensive promotion advertising and merchandising by a competent and imaginative distributor was vital.

38. Existing business considerations made the selection of a distributor for Universal's pre-1948 features a very important and serious step.

39. Universal could not distribute its pre-1948 inventory itself; it had neither the facilities nor the personnel to do so. The creation and development of the required sales and promotional organization entailed expenditures and risks which Universal was not prepared to assume.

40. Universal could market its pre-1948 feature films either through a "library" or "bulk" sale to television stations for a fixed period of time, or by the license of the pictures in small groups for limited engagements.

41. Universal preferred to license its library through a distributor in small groups and for a limited time because its executives judged that this method of distribution offered the possibility of a greater over-all return to Universal in view of the type and quality of its pictures.

42. In October, 1956, Universal decided that it had neither the facilities nor the personnel to distribute its pre-1948 inventory itself.

43. Universal, beginning in October, 1956, sought a qualified distributor with the requisite organization and financial responsibility to take over the distribution of its pictures for television exhibition.

44. Universal in good faith and with due diligence placed its pre-1948 feature films on the market for the best offer which would be made by a distributor having the proper qualifications.

45. Universal negotiated in good faith beginning in November 1956 with a prospective licensee, General Teleradio Company.

46. General Teleradio owned RKO Pictures Company, a major producer of feature films, and was distributing RKO feature films for television exhibition.

47. Universal negotiated in good faith with the Dumont Broadcasting Company and with Bernard Goodwin, its President from November 12, 1956 to April 11, 1957.

48. Universal negotiated in good faith with the Zugsmith Group from January 21, 1957 through April 24, 1957.

49. Universal negotiated in good faith with Harry Franks and his associates from April 24, 1957 through May 27, 1957.

50. Universal negotiated in good faith with National Telefilm Associates from February 12, 1957 through April 16, 1957.

51. Universal negotiated in good faith with Imperial World Films, Inc. from March 25, 1957 to April 3, 1957.

52. Universal negotiated in good faith with the Associated Artists group from March 28, 1957 to April 17, 1957.

53. In addition, Universal received many inquiries from persons or firms interested in obtaining rights to its library. These when pursued were found to be of questionable value since they came from persons and firms which were either financially unsatisfactory, or had no adequate facilities for distribution.

54. Universal executives entertained every offer made for television rights to its pre-1948 library, and gave careful and deliberate consideration to each of them.

55. Screen Gems offered a substantial dollar guaranty against a continuing participation by Universal in the gross attained by Universal pictures, individual distribution on a small package basis, and the services of a dynamic distribution organization.

56. Screen Gems commenced distributing programming for television in 1949. By January 1, 1956 Screen Gems was engaged in distributing films made originally for television and short subjects, cartoons and comedies made originally for theatrical exhibition.

57. In February 1956 Screen Gems contracted with Columbia to distribute for television exhibition the feature films produced and released for theatrical exhibition by Columbia prior to August 1, 1948. Screen Gems and Columbia consider that of the features covered by the contract 439 have a value for television sufficient to justify the expense of distributing them. By mid-1957 all of these were in distribution except about 190. The remainder were released between August 1, 1957 and January 1, 1960.

58. During its operations prior to entering into the contract with Universal, Screen Gems had successfully merchandised syndicated features, one-half and one-hour shows, shorts and television material which gave it a comprehensive knowledge of the market. The sales and other executives impressed Universal executives favorably. These factors indicated to Universal executives that Screen Gems had the facilities and ability to compete in the market of distributing television programming.

59. In the final analysis, Universal was obliged to choose among competing distributors, each of which had the pre-1948 pictures of another major film producer. General Teleradio distributed RKO pictures. National Television Associates were distributing Twentieth Century-Fox features, the J. Arthur Rank features and some Selznick features. Associated Artists was the company which had acquired the Warner Bros. features. In the last analysis, the choice which Universal had was among competing distributors.

60. After negotiating with offerors which were potential distributors of its pre-1948 library Universal's choice finally narrowed as between Associated Artists (which distributed for television purposes in bulk library deals and had the pre-1948 library of Warner Bros.) and Screen Gems (which distributed feature films for television purposes in small packages, and had the pre-1948 library of Columbia).

61. All of the proposals which appeared capable of acceptance were analyzed carefully.

62. Universal considered fully the inquiries of various distributors interested in distributing its feature films. Universal finally selected Screen Gems because Universal believed that its features could be distributed to television by Screen Gems better than by the other distributors under consideration. Screen Gems' large, capable sales force had experience with all forms of filmed television programming, including feature films. Also, Screen Gems offered distribution through the retail method of sublicensing in relatively small groups of features, instead of through the library method of sublicensing an entire library at one time. Furthermore, Screen Gems and its parent were able to give a guaranty of $20 million against a continuing interest by Universal in the gross obtained by its features.

63. Universal is not, and has never been, an actual or potential competitor of Columbia or Screen Gems in the distribution of television programming material.

64. In mid-1957 Screen Gems also had distribution rights to approximately 400 feature films formerly distributed by Hygo Television Films, Inc. and its affiliated companies (collectively "Hygo"). These 400 features films were of very little value for television; Screen

Gems made its distribution agreement with Hygo concerning these films not because of their intrinsic value but principally to obtain the services of Jerome Hyams, the president and principal stockholder of Hygo, and his organization. Mr. Hyams is now Vice President and General Manager of Screen Gems.

65. Prior to and at the time of the execution of the Agreement in mid-1957 Screen Gems was faced with the competition of distributors of all types of television programming, including larger and more valuable libraries of feature films. In order to replace its dwindling inventory of television programming, Screen Gems decided to bid for Universal's pre-1948 feature films, which had been previously offered. Replenishment of its inventory was necessary to enable Screen Gems to keep pace with its many competitors, to provide its sale force with a continuing supply of programming for customers, and to furnish revenue for future years.

66. The contract between Universal and Screen Gems in which Universal granted an exclusive television distributorship of its feature films produced and released for theatrical exhibition prior to August 1, 1948, was entered into in a background of long motion picture activity in which Universal itself had been a distributor of motion pictures in which others had a financial interest; that the bargaining preceding the entering into of the said agreement was long, detailed and at arm's length.

67. Universal found it necessary that safeguards be included which would assure to it a competitive position for its pictures in the television market, for example, its pictures were to be licensed without conditioning their license on the license of any other picture and without discrimination either in favor of or against them.

68. On August 2, 1957 the defendants executed the Agreement, by which Universal granted to Screen Gems for a period of approximately fourteen years, the exclusive television distributorship of the feature films produced and released for theatrical exhibition by Universal prior to August 1, 1948 (with limited exceptions not material here).

(a) The bargaining between Screen Gems and Universal which preceded the execution of the Agreement was severe and conducted at arm's length. The Agreement was adopted only after many drafts had been prepared and extensive negotiations conducted.

(b) The distributorship is for a period of up to fourteen years and is non-assignable. Universal grants only the right to distribute the films for television exhibition; Universal reserves all other rights in the films and continues to own them. Sections III, VII.

(c) In addition, the Agreement required Screen Gems to distribute the pictures diligently in order that the greatest possible revenues may be realized for itself and Universal. Section V.1.

(d) Screen Gems was required to release not less than 78 Universal features in each of six annual periods (Section V.6), to negotiate with sublicensees concerning the Universal features on a non-discriminatory basis (Section V), and to make annual minimum payments to Universal which total $20 million during the first seven years of the contract. Section X.9.

(e) The Agreement provided that all sales and other policies relating to Universal pictures and their distribution should be formulated jointly by Screen Gems and Universal (Section V.3); that Screen Gems would not grant any sublicense for Universal's pictures on terms less favorable than for Columbia's (Section V.7); and that Screen Gems would submit to Universal, in advance of the release of any Universal features, a schedule of minimum prices below which Screen Gems was not to sublicense the Universal features without Universal's approval. Section V.7.

(f) The Agreement permits Universal to conduct an audit of Screen Gems' sales records as set forth in Section XI and requires Screen Gems to render reports to Universal showing the sublicens-

ing of each Universal film and the sublicensing of other films included in transactions involving Universal films.

(g) The Agreement also provides that the revenues resulting from a sublicense which includes both Universal features and Columbia features shall be allocated to Universal and to Screen Gems on the basis of the value assigned by those defendants to each of the features included in the sublicense. Sections V.14, X.5. To effectuate this purpose, in those cases where a package of feature films is composed of Columbia features and Universal features, Universal and Screen Gems agree on the proportion of revenues attributable to each of the features in the package. Each of the features in the package is assigned a classification, either "A", "B", "C" or "D" according to its relative value. Section V.14. After a package was assembled and the classifications were agreed upon, unit values were accorded to the classifications ranging from six points for an "A" to two points for a "D". In this manner the proceeds from any sale could be fairly allocated on the basis of respective value contributed.

69. The contract also provides for the payment to Screen Gems of a distribution fee and Screen Gems as distributor guarantees to Universal that Universal will receive and be paid not less than two million dollars during the first annual period and three million dollars during each of six successive annual periods. The remaining provisions of the contract spell out the commitments and warranties and the obligations of each of the parties.

70. Each of the provisions of the contract had lawful business objectives and was not included for the purpose of fixing prices.

71. By its agreement with Screen Gems, Universal sought to have an active experienced distributor license its pictures in the same manner as Universal, acting itself, legally could have distributed them.

72. There is no one paragraph of the contract that by itself indicates what the parties were trying to accomplish * *. Each one was tied into the other in some way.

73. Universal had insisted on contract approval because it wanted to know how the pictures were being sold; approving the contracts was one way to find out.

74. The right of approval of contracts was carried over from Universal's motion picture experience with producers' representatives in the theatrical field.

75. The minimum rate schedules were proposed by Screen Gems as a compromise for the elimination of the right of approval by Universal, of each sublicensing contract.

76. An analysis of the operation of various sections of the contract indicates that neither the rate schedules, rate cards nor classification system were instrumentalities for achieving price fixing.

77. Explanations of various sections of the contract by Norman Gluck, disclose their true meaning.

78. *Sect. V.1—General Obligations:* this section means that Screen Gems accepted the license and undertook completely and diligently and in accordance with sound sales business judgment to realize the greatest possible amount of net proceeds.

79. *Sect. V.2—Facilities:* states that Screen Gems shall maintain adequate field and supervising personnel and facilities in order to comply with its contract obligations.

80. *Sect. V.3—Joint Participation:* this section was so worded in order to get the most out of the inherent value of the pictures and to take advantage of Universal's merchandising experience which could be extremely useful.

81. *Sect. V.4—Policy Concerning Columbia Product:* this was a provision regarding merchandising; and was intended to assure that, if Screen Gems adopted any other policies in the distribution of its pictures which were not used in the merchandising of Universal pictures, Screen Gems would also adopt such a policy in licensing Universal pictures.

82. *Sect. V.4* had nothing to do with prices, or fixing prices.

83. *Sect. V.5—General Sales Policy:* the merchandising of Universal pictures was to be done in small groups in the so-called retail selling method, a factor Universal considered very important. If this method was changed, Screen Gems would not be required to obtain Universal's approval to do so. Only in the event that Screen Gems wanted to make a library deal for Universal's pictures alone, would it be required to obtain Universal's approval.

84. *Sect. V.5* was not designed as, nor was it, a price-fixing device.

85. *Sect. V.6—Release Policy:* this section was included to assure that the Universal pictures were actually released for television purposes.

86. *Sect. V.7—Rate Schedules:* this section was included when Screen Gems refused to grant the right of contract approval to Universal. Universal did not participate in the preparation of rate schedules. In the event that Screen Gems differed with Universal as to this section, the decision of Screen Gems was final. This section also contains the provision that Universal pictures may not be sublicensed for less than Columbia pictures of comparable quality. This was intended to protect Universal from discrimination, and was not intended to be, and has not been used as, a device to fix prices.

87. *Sect. V.8—Non-monetary Considerations:* this section was included in order that Universal should not be involved in any barter deals without its approval. It wanted cash instead of payment in television time.

88. *Sect. V.9—Approval:* this section provided that the name of the station, license fee, method of payment, the number of runs and the duration of each sublicense be submitted to Universal.

89. *Sect. V.10—Individual Negotiation Contract:* this section provided that the pictures were to be sub-licensed and negotiated individually, and that the terms would be included in a written contract after such negotiations were concluded.

90. The last four provisions of the Agreement described above were insisted upon by Universal as a safeguard to its interests.

91. Substantially everything was in contention during the negotiation of the Agreement because there were so many items in the contract that either protected Universal or protected Screen Gems.

92. In the contract, while Universal granted Screen Gems a limited right to sublicense the pictures in the Universal library to television stations in the United States, Alaska, Hawaii, Puerto Rico and Canada, Universal retained many other valuable rights, including the following: (a) the right to remake; (b) the right to reissue; (c) live rights; (d) the right to produce a live television show from the same property on which the motion picture was based; (e) non-theatrical rights; (f) deferment rights; and (g) packaged film rights.

93. *Sect. V.11—Fair Treatment:* this section provided that the pictures would be sold on the basis of their respective market value, and that the license fee should be fair and non-discriminatory; and that the licensing of one picture would not be conditioned upon the licensing of any other picture.

94. *Sect. V.12—Conflicting Interests:* this section was to assure that, in the event a license was made to a television station in which Screen Gems' or Columbia's executives had an interest, and where Universal pictures were included in the license, the license fee was at fair market value.

95. *Sect. V.14—Classifications:* this section provided for the division of money between Screen Gems and Universal after a license was obtained. Classifications could not and were not used to fix prices. Their sole function related to the dividing and allocating of sales proceeds after the sale had been made. They served no purpose until the sale was made. Classifications did not mean any-

thing until there was money to divide. No price bracket was ascribed or attributed to pictures classified as A, B, C or D pictures.

96. There was no correlation, directly or indirectly, between A, B, C and D classifications or any monetary or price index.

97. There was no secret arrangement or code, or any formula or equation whereby the parties to the contract could translate or transmute the letters A, B, C, D into a money expression.

98. The classification and unit systems have no relationship in fact nor in operation to the questions of accepting an offer or determining whether the minimum rate schedule relating to Universal pictures was or was not satisfied.

(a) No classifications are assigned under the agreement where a package covers only Universal or only Columbia feature films. Titles in a mixed package are generally classified immediately prior to release.

(b) The classifications are not known to Screen Gems' salesmen or to sublicensees.

(c) The classifications are not used by any person at Screen Gems in negotiating or executing sublicenses.

(d) The sole purpose of the classification procedure is to enable the proceeds from a sublicense to be divided fairly between Screen Gems and Universal based upon the relative value of the contribution each has made to the particular group of films covered by the sublicense.

(e) The classification procedure was not intended to and did not have the effect of fixing prices between Universal and Columbia feature films or of eliminating price or other competition between Universal and Columbia.

(f) Elimination of the classification procedure would in no way affect market prices, prices obtained by Screen Gems or the negotiating process between Screen Gems and prospective sublicensees.

99. The minimum rate schedules for Universal feature films were drawn up by Screen Gems without consultation with Columbia or Universal. Minimum rates were in the form of an estimated minimum per title for a particular city regardless of the actual value or classification of any of the titles in a package. The rates were purposely set very low by Screen Gems so that referrals of offers to Universal which were below the schedule were rare and infrequent. The minimum rate schedule was adopted as an alternative to a clause originally proposed by Universal whereby Universal would have the right to approve every deal made by Screen Gems. The necessity of speedy decision in an extremely volatile market made a prior approval provision unacceptable to Screen Gems. The minimum rate schedule was not known to Screen Gems salesmen. They are given a rate card which suggests a high initial asking price for purposes of negotiation with stations. Minimum rate schedules were not used after the November 3, 1958 amendment to the agreement.

100. Universal's right to disapprove a sublicense does not extend to Columbia's feature films. Screen Gems is free to sublicense the Columbia product in a mixed package in the event Universal withholds approval concerning its pictures.

101. None of the defendants regarded the agreement as violating the Sherman Act. During the drafting of the agreement, there was no conversation between the parties or their attorneys concerning the possibility that any of the provisions violated the antitrust laws.

102. By agreement executed November 3, 1958, the defendants amended the agreement to eliminate certain provisions contained in Sections V.3 and V.7 of the agreement. The amendment further provides that Screen Gems will submit to Universal each proposed sublicense that it intends to execute for the Universal features and that Universal has the right to disapprove such proposed sublicense only if it is on terms less than the fair market value of such Universal features at that time.

103. In connection with the Sherman Act, § 1 cause of action and the allegations in the complaint relating thereto, the Government is not relying on any oral understanding or parol agreement between Columbia, Screen Gems or Universal extrinsic to the written agreement of August 2, 1957.

104. The defendants' dominant purpose in entering into the agreement was to use the organized national distribution system of Screen Gems in order for Universal to have its feature films sublicensed to television stations in an efficient manner and for Screen Gems to have a source of supply of television programming material needed to enable its distribution organization to continue to operate efficiently.

105. It was not defendants' motive or intention to fix prices or to eliminate competition between themselves; and the agreement was not entered into for that purpose.

106. Defendants have promised not to reinstate or observe the provisions eliminated by the amendment, although always maintaining that those provisions were proper.

107. The provisions contained in Sections V.3, V.7 and XI.2 of the agreement are similar to many other agreements in the theatrical motion picture industry and in the television industry. They are commonly inserted at the instance of a producer to protect his product in the distribution process.

108. Common distributorships, by which one firm distributes the films owned by a number of producers, are often found in the motion picture and television industries.

109. Since August 2, 1957 Screen Gems has released seven packages of features:

| Package and No. of Titles | Release Date | Columbia Features | Universal Features |
|---|---|---|---|
| Shock—52 | August, 1957 | 0 | 52 |
| Triple Crown—104 | December, 1957 | 52 | 52 |
| Son of Shock—20 | May, 1958 | 11 | 9 |
| Sweet 65—65 | July, 1958 | 26 | 39 |
| Powerhouse—78 | December, 1958 | 26 | 52 |
| Triumph—104 | April, 1959 | 54 | 50 |
| Unnamed—78 | October, 1959 | 28 | 50 |

110. It is Screen Gems' practice in distributing programming, including Universal features, not to price film individually. Instead, Screen Gems and its sublicensees agree upon a single price for all the films covered by a sublicense. Consequently, no prices are set by Screen Gems or its sublicensees for any Universal feature alone.

111. Where a mixed package of Columbia and Universal features is offered to a sublicensee, he is free to select those films which he wants whether they are Columbia or Universal. In practice, the sublicensee frequently does select less than the entire package, which is known as "creaming" the package.

112. Neither the agreement itself nor operations thereunder have affected the price of Columbia or Universal feature films, or the general market price of feature films or other television programming material.

This absence of effect is due to the realities of the marketplace, in which prices for television programming material, including Columbia and Universal feature films are established by economic factors and forces wholly external to the agreement.

Such factors and forces are discussed at length in the portion of this opinion relating to the Clayton Act Section 7 issue of lessening of competition. They

may be briefly summarized here as including: the relatively small portion of the market accounted for by Screen Gems' sales; the heavy competition encountered by Screen Gems from other distributors of programming material; the bargaining strength of buyers; the cumulative increasing supply of television programming; and the increasing difficulty encountered by Screen Gems in attempting to sublicense its feature films.

113. There is no understanding of any kind between Screen Gems and Universal with respect to Universal's post-1948 library.

The stipulations between the parties and the record evidence summarized above establish that the central purpose for which Universal, Screen Gems and Columbia joined in the distribution agreement was the efficient marketing of Universal feature films through an existing national distribution organization. The distribution by Screen Gems of Universal features is a legitimate business transaction. Its legitimacy is conceded by the Government, for it has stated on the record that it does not claim that that arrangement, as such, is *per se* illegal.

As already indicated, the specific clauses to which the Government objects [2] were insisted upon by Universal to protect its financial interest in the feature films against discrimination by Screen Gems. These clauses are, therefore, at most ancillary to the principal transaction, itself legitimate, of Screen Gems' distributing Universal films.

Assuming *arguendo* that those specific non-discrimination provisions restrain trade, their validity is not to be judged by application of the *per se* rule.

### The Doctrine of Ancillary Restraints

■ Where challenged conduct is subservient or ancillary to a transaction which is itself legitimate, the decision is not determined by a *per se* rule. The doctrine of ancillary restraints is to be applied. It permits, as reasonable, a restraint which (1) is reasonably necessary to the legitimate primary purpose of the arrangement, and of no broader scope than reasonably necessary; (2) does not unreasonably affect competition in the marketplace; and (3) is not imposed by a party or parties with monopoly power.

United States v. Bausch & Lomb Optical Co., D.C.S.D.N.Y.1942, 45 F.Supp. 387, affirmed by an equally divided court, 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 204 F.2d 331, certiorari denied 1953, 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (followed Bausch & Lomb, supra); Walt Disney Productions v. American Broadcasting-Paramount Theatres, Inc., D.C.S.D.N.Y.1960, 180 F. Supp. 113.

■ The doctrine was first authoritatively stated in a Sherman Act context by Justice (then Judge) Taft, in United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 282, affirmed 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. It permits, as reason must, business arrangements of benefit to the parties, and perhaps to the public, which have no injurious effect in the sense of antitrust policy.

■ In the case at bar, it permits a producer (Universal) who does not have the ability to engage in proper distribution to engage the distribution facilities (Screen Gems) of a producer (Columbia) who does. It also permits the distributing organization to continue its function, by replenishing its supply of product to distribute.

The typical ancillary restraint case involves a clear, unambiguous covenant that one party would refrain from com-

---

2. Section V.3 (dealing with joint formulation of sales policy); Section V.7 (requiring Screen Gems to submit minimum rate schedules to Universal and insuring against the less favorable treatment of Universal films), Section V.14 (dealing with classification), and Section XI (dealing with audits of Screen Gems' books by Universal).

petition, in other words, an outright and direct elimination of competition. This is in marked contrast to the provisions attacked by the Government in the case at bar, where it cannot be said either from a reading of those provisions or from the testimony explaining them that they were intended to affect the prices charged by Screen Gems to television stations or in any other way to eliminate competition between Columbia, Universal and Screen Gems. In short, the typical ancillary restraint case presents a much clearer elimination of competition than the situation at bar, where the effect of the attacked covenants on competition is far from clear.

Thus, even on the assumption arguendo that there was a reduction in competition by reason of the attacked clauses, the validity of the ancillary restraint is to be determined in light of its reasonableness as viewed under all the circumstances. The Government in the case at bar has refused to undertake this burden.

Sections V.3 and V.7 of the Distribution Agreement were excised by the November 3, 1958 amendments. At the time of the amendments, during the course of the trial testimony, and in their final submission, defendants have stated and reiterated that they do not intend to revert to the original provisions of the original Distribution Agreement. Defendants are prepared to give any assurance to the Court and to the Government of their intentions in that regard.

In view of the fact that the Court is adjudicating the validity of the Distribution Agreement on the merits, there is no need to determine whether this Court, sitting in equity, has the discretionary power (as defendants contend) to dismiss the Sherman Act case. See United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; Murphy v. Benson, 2 Cir., 1959, 270 F.2d 419, certiorari denied Murphy v. Butler, 1960, 362 U.S. 929, 80 S.Ct. 750, 4 L.Ed.2d 747; United States v. Logan Co., D.C.N.D.Pa. 1957, 147 F.Supp. 330; United States v. Insurance Board of Cleveland, D.C.N.D.

Ohio 1956, 144 F.Supp. 684; Stokely-Van Camp, Inc. v. FTC, 7 Cir., 1957, 246 F.2d 458; Mitchell v. Hertzke, 10 Cir., 1956, 234 F.2d 183.

Considering the contract provisions attacked by the Government, the Court finds that they did not and do not have the effect ascribed to them by the Government.

Section V.3 was inserted to ensure that Universal had the right to consult with Screen Gems on the best marketing of the Universal library. The library had certain qualities that could, if merchandised properly, return a considerable amount of money; and Universal had been successful in doing this in the theatre business. Universal had a continuing financial interest in the proceeds of distribution and insisted on a voice in the policy decisions as to how its library was to be merchandised: on the retail or the library basis of selling feature films.

This section, hence, had nothing to do with the prices Screen Gems charged television stations, and was obviously designed to assure Universal that it would have an opportunity to use its knowledge of its feature films in their promotion and merchandising.

Section V.7 was included as a substitute for one that was originally pressed by Universal. Because Universal feared that its features might be discriminated against, it first sought the right to approve each and every deal made by Screen Gems involving a Universal feature film. The Screen Gems executives responsible for negotiating the Distribution Agreement objected to any such provision on the ground that it would be impractical, too time-consuming and would severely hamper Screen Gems' ability to close deals with television stations. The minimum rate schedule provided in the above quoted provision was adopted as an alternative safeguard to Universal, to serve as a quick rule of thumb to advise Universal as to the minimum return.

The minimum rate schedule was prepared solely by Screen Gems without consultation with Universal. The rates

shown on the minimum rate schedules were set by Mr. Hyams purposely low so that it would not be necessary for Screen Gems to seek Universal approval except in rare instances. Moreover, the minimum rate schedules were limited to Universal films, and the Columbia films in any package could be sold at any price. In other words, Universal had no authority whatever over sales of Columbia films and Universal sought protection solely for its own. That the minimum rate schedule did not affect the price which Screen Gems negotiated with television stations is made clear by the fact that the rates set forth on the schedule were on the basis of an average price per Universal feature, giving to each feature in the package an equivalent value without regard to quality.

The overwhelming weight of credible evidence establishes that feature films were not and are not sold to television stations singly. On the contrary, features are generally sold in packages for a lump sum price. No price per picture is negotiated with the television station and no such price is set forth either in the sublicensing contract, the bills rendered by Screen Gems to the television stations or in Screen Gems' monthly reports to Universal. Yet the features in a package were of varying quality (and received varying classifications). This simply proves that the minimum rate schedule was designed to serve only as a quick rule of thumb to advise Universal as to the minimum return.

The clause of Section V.7 of the Distribution Agreement prohibiting Screen Gems from licensing Universal features on terms less favorable than comparable Columbia product, which clause was also excised on November 3, 1958, did not operate as a price fixing device in the period August 2, 1957 to November 3, 1958.

As to Section V.14, relating to "Classifications," the amendment of November 3, 1958 eliminated the next to last sentence in that provision and the clause in the second sentence beginning with the word "with" and ending at the end of the sentence with the word "it."

This provision of the original Distribution Agreement is attacked by the Government not only on its face, but in its operation as well. Here, too, an analysis of the evidence leads to the conclusion that the Government has failed in its burden of proving that the provision amounts to "price fixing."

It is clear from a reading of the classification provisions and the testimony of the Screen Gems and Universal executives responsible for performing the Distribution Agreement that the provision has no relation to the prices at which Columbia and Universal films are sold or sublicensed by Screen Gems to television stations. In the nature of the distribution setup, with Screen Gems selling the product of both Columbia and Universal in mixed packages for a lump sum price, it becomes necessary after each deal is made to divide that lump sum between Columbia and Universal. It would have been possible for the parties to have decided upon an arrangement requiring consultation and agreement following each deal as to the allocation of the proceeds. Because feature films are not fungible, in the sense that each has its own individual appeal and value, based on story, stars, performance in its theatrical run and similar factors, it is obvious that it would not be fair to assign an equal monetary value to each film involved in a sublicense. Thus it could be foreseen that the parties would at times encounter considerable difficulty in working out the allocation after each deal was made.

To avoid such squabbles the parties agreed upon the classification system. The evidence establishes that this system operated only as a means of allocating the proceeds of sale, once made. The classification of the features into "A", "B" "C" and "D" films, and assigning unit values to each, did not figure into the establishment of the price at which the features in the package were sold to a television station.

The evidence shows further that the unit values and the classifications have no counterpart in dollar value and that the purpose was solely to establish pro-

portions between Columbia and Universal product in a particular package so that *after* a sale was made and price established, the proceeds could be allocated equitably and without further negotiations and agreements.

Moreover, the evidence shows that the Screen Gems salesmen who conducted the critical negotiations with the television stations in the country, including price terms, were never aware of the classifications. That classification had no relation to prices charged television stations is further borne out by the fact that at times Universal and Screen Gems did not agree upon the classifications of features in a package until after sales had been made.

Sections XI.1 and XI.2, relating to the maintenance of records and Universal's right of audit, were unaffected by the amendment of November 3, 1958.

The Government never made clear the basis of its objection to these sections. Taking into consideration the important business relations established by the Distribution Agreement, it was reasonable for the parties to permit the principal, Universal, to audit the books of its distributor, Screen Gems, in relation to those matters which might affect Universal's feature films. There was no relation to prices.

There is no proof in the record that the attacked clauses of the Distribution Agreement have had any effect in the marketplace. The Government itself called three station witnesses, but put no question designed to elicit from them what the competitive effect of the Distribution Agreement was during the more than two and one half years it was being performed prior to trial.

*Conclusion*

█ The Government has failed to sustain its burden of proving by a fair preponderance of the credible evidence that the defendants entered into or operated under an agreement or arrangement to fix prices. The Government has failed

to prove a violation of Section 1 of the Sherman Act. On the other hand, the defendants affirmatively and convincingly demonstrated by the clear weight of the credible evidence that the agreement is not one to fix prices and does not otherwise violate Section 1 of the Sherman Act. The Sherman Act Section 1 charge is dismissed on the merits.

The Clayton Act Section 7 Charge

*The Four Issues*

The Clayton Act claim involves four issues: (1) whether there has been an acquisition of assets within the meaning of Section 7; (2) what is the appropriate line of commerce; (3) what is the appropriate section of the country; and (4) whether there is a reasonable probability of a substantial lessening of competition. If defendants prevail on any one of these four issues, they are entitled to judgment. Each of these issues will be considered separately. Section 7 of the Clayton Act relevantly provides:

"That * * * *no corporation* subject to the jurisdiction of the Federal Trade Commission *shall acquire the whole or any part of the assets of another corporation* engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." (Emphasis added.)

*Screen Gems' Acquisition of Part of Universal's Assets*

█ Defendants erroneously contend that the phrase "acquiring the whole or any part of the assets of another corporation" must be construed as embracing "only mergers or their equivalent, or stated differently, amalgamations of business enterprises." This is a too restrictive construction.

█ As used here, the words "acquire" and "assets" are not terms of art or technical legal language.[3] In the con-

---

3. "Technical words" must be taken "in their technical sense." Holmes, J. in

United States v. Storrs, 1926, 272 U.S. 652, 654, 47 S.Ct. 221, 71 L.Ed. 460,

text of this statute, they are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring person may accomplish the acquisition by means of purchase, assignment, lease, license, or otherwise. The test is pragmatic. The final answer is not in the dictionary.

The statute imposes no specific method of acquisition. It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse "effect."

The broad sweep to be given to the term "acquire" is also suggested by the circumstance that the following words are unrestricted, i. e., "the whole or any part of the assets." Nothing could be more unqualified than the words "any part." Those words likewise must be given a liberal interpretation.

Consistent with the broadly-drawn language is the word "assets." It is not a word of art, nor is it given a built-in definition by statute. As used in this statute, and depending upon the factual context, "assets" may mean anything of value.[4]

The fact that an item of value may not be treated as an asset for purposes of taxation or bookkeeping, while having some evidential significance, is not conclusive. The word "assets" usually has a technical connotation in the field of taxation and accounting. There is nothing in the legislative history of Section 7 to justify the defendants' viewpoint that the word "assets" is to be interpreted through the eyes of tax experts or accountants rather than business men, or that "assets" means only "capital assets."

Congress was painting with a broad brush when it prohibited the acquisition of the whole or any part of the assets of another corporation, where the effect of such acquisition may be substantially to lessen competition. The language was deliberately couched in general and flexible terms. Its vague contours are characteristic of the antitrust statutes. It is a judicial responsibility to contribute to the fashioning of a coherent body of substantive law out of the Congressional policy and language.

By reducing the quantum or size of the part of the assets involved or by changing the character of the property acquired, one may hypothesize cases lying in the penumbra of the statutory prohibition. Questions of degree confront the courts daily. The statutory language and its policy, applied to this trial record, furnish judicial footing to ascend to the solution.

The provision under consideration was purposely added to the pre-existing acquisition-of-stock prohibition. Its objective was to extend the coverage of Section 7 to the acquisition of assets.[5]

---

quoted in the dissenting opinion in United States v. Mersky, 1960, 361 U.S. 431, 452, 80 S.Ct. 459, 4 L.Ed.2d 423. In the case at bar, both sides agree that Congress did not intend "acquire" to have a special meaning.

4. The House Report on the Celler-Kefauver Bill said: "The bill retains language of the present statute which is broad enough to prevent evasion of the central purpose. It covers not only the purchase of assets or stock but also any other method of acquisition, such as, for example, lease of assets. It forbids not only direct acquisitions but also indirect acquisitions, whether through a subsidiary or affiliate or otherwise." H.R.Rep. No. 1191, 81st Cong. 1st Sess. 8–9 (1949).

There is no basis for restricting the term "assets" to tangible property. It includes intangibles or choses in action as well. See Farm Journal Inc., F.T.C. Dkt. 6388, 53 F.T.C. 26, 48–49 (1956) (opinion of the hearing examiner, adopted by the Federal Trade Commission without opinion, 53 F.T.C. 26, 52) (1956), in which the registered names of a magazine, the subscription list and the list of advertisers were treated as assets. Their acquisition was held violative of Section 7. See also Kessler & Stern, Competition, Contract, and Vertical Integration, 69 Yale L.J., 1, 75–76 notes 348 to 353, and 359, 360.

5. The 1950 amendment (Celler-Kefauver Act, 64 Stat. 1125 (1950), 15 U.S.C.A. § 18; see United States v. Bethlehem

It is not yet possible to chart the precise boundaries of the words "acquire" and "assets" in terms of the longitude of precedent or the latitude of policy.

In these circumstances and, assuming *arguendo* that the statute is reasonably susceptible of two interpretations, the Court prefers the meaning that tends to effectuate the central purpose of the legislation.

The Court is mindful of the fact that this is not a procedural statute. It is regulatory, remedial and substantive. It is designed to eliminate business arrangements deemed undesirable by Congress.

Since the proscribed transactions may be myriad in their variegation, Congress did not catalogue them. It is for the courts to enforce the statute on the traditional case-by-case basis.

We conclude that neither legislative history, policy, language nor logic would warrant the Court's restricting the meaning of "acquisition" of "assets" in Section 7 to transfers of property of any particular magnitude.

Universal licensed Screen Gems for a period of fourteen years as its *exclusive* distributor of its copyrighted pre-1948 feature films for television exhibition. For this, Screen Gems was to receive a substantial commission (27½%) after Screen Gems recouped certain expenses from gross proceeds. Screen Gems was to make annual minimum payments to Universal which total $20 million.

That Universal retained many valuable rights in and to the licensed feature films does not attenuate the fact that Screen Gems acquired valuable rights by means of the exclusive license. The rights thus acquired had substantial economic value for a long term.

■ The thrust of the statute is not deflected by the negative circumstance that Universal did not transfer even more extensive rights to Screen Gems or that Screen Gems' rights were limited and its license was non-assignable. The thrust of the statute is propelled by the affirmative evidence of what Screen Gems did acquire. The Court concludes that by entering into and performing the exclusive long-term license-distribution arrangement, Screen Gems acquired a part of Universal's assets within the meaning of Section 7 of the Clayton Act.

*Television Programming Material Is the Appropriate Line of Commerce: Feature Films Is Not the Appropriate Line of Commerce*

■ Plaintiff has failed in its burden of proof because it has not proved by a fair preponderance of the credible evidence that the "line of commerce" or "product market" is limited to the distribution of feature films to television stations. The evidence overwhelmingly establishes that the relevant line of commerce is broader than feature films. It encompasses all forms of television programming material, including syndicated film produced specifically for television, videotaped and live shows, cartoons and shorts.

■ To determine whether or not there is a reasonable probability of a substantial lessening of competition, Section 7 of the Clayton Act demands an examination into economic realities. All competition must be considered, including competition faced by the product in question from other products.

The tests enunciated by the authorities are consistent. Effectively, the test "rea-

Steel Corp., D.C.S.D.N.Y.1958, 168 F. Supp. 576, 582–583; Dirlam, The DuPont-General Motors Decision, 58 Colum. L.Rev. 24, 42, n. 87 (1958), was designed to cover asset acquisitions and to eliminate the immunity that some decisions had given to property or business acquisitions. See Arrow-Hart & Hageman Elec. Co. v. F. T. C., 1934, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007; F. T. C. v. Western Meat Co., 1926, 272

U.S. 554, 561, 47 S.Ct. 175, 71 L.Ed. 405; Note, "Substantially To Lessen Competition * * *": Current Problems of Horizontal Mergers, 68 Yale L.J. 1627, 1629; notes 15 and 16; Kessler & Stern, Competition, Contract, And Vertical Integration, 69 Yale L.J. 1, 65, n. 288; Hearings before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st. Sess., ser. 10, at 16 (1949).

sonable interchangeability for the purposes for which (the products) are produced—price, use and qualities considered," [6] and the test "sufficient peculiar characteristics and uses to constitute them products sufficiently distinct * * to make them a 'line of commerce' within the meaning of the Clayton Act" [7] are but different verbalizations of the same criterion.[8]

They require the same accumulation and scrutiny of facts and application of judgment. The task is to find the area of effective competition.[9] The "characteristics and uses" formulation does not limit the court's inquiry to physical attributes and foreclose inquiry into the competitive situation.

A cogent statement of the factfinder's task was made by the Federal Trade Commission in Brillo Mfg. Co., FTC Dkt. 6557, CCH Trade Reg. Rep., Par. 27,243 (1948). The FTC has a coordinate responsibility with the district courts in the enforcement of the Clayton Act. In Brillo, the FTC said:

"We think the hearing examiner in concluding as a matter of law that industrial steel wool was the relevant market erred in basing his determinations solely on the fact that those were the wares being produced by the acquired and acquiring companies. The test instead is whether these products are shown by the facts to have such peculiar characteristics and uses as to constitute them sufficiently distinct from others to make them a 'line of commerce' within the meaning of the Act. United States v. E. I. duPont de Nemours & Co., 353 U.S. 586 [77 S.Ct. 872, 1 L.Ed.2d 1057] (1957). That the acquired and acquiring corporations both made industrial steel wool was only one circumstance to be considered. Additional factors which could have been taken into account include data relating to the manner in which the products are marketed, their physical characteristics, prices and possibly other things bearing on the question of whether or not they may be distinguished competitively from other wares. On the other hand, as the examiner in essence held, the mere fact that articles other than steel wool are marketed for industrial use as abrasives is not adequate legal warrant

6. United States v. E. I. DuPont de Nemours & Co. (Cellophane), 1956, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (a Sherman Act case); International Boxing Club v. United States, 1959, 358 U.S. 242, 250, 79 S.Ct. 245, 3 L.Ed.2d 270 (a Sherman Act case); American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 1958, 259 F. 2d 524, 529. Cf. United States v. Brown Shoe Co., D.C.E.D.Mo.1959, 179 F.Supp. 721 prob. juris. noted, 363 U.S. 825, 80 S.Ct. 1595, 4 L.Ed.2d 1521.

7. United States v. E. I. DuPont de Nemours & Co. (DuPont-General Motors), 1957, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057; United States v. Bethlehem Steel Corp., D.C.S.D.N.Y. 1958, 168 F.Supp. 576; Brillo Mfg. Co., FTC Dkt. 6557, CCH Trade Reg.Rep. Par. 27, 243 (Decision of the Commission, 1958) (The Commission also used the formulation: "whether (the products) may be distinguished competitively from other wares."); A. G. Spalding & Bros. Inc., FTC Dkt. 6478, CCH Trade Reg. Rep. Par. 28, 694 (Decision of the Com-

mission, 1960); Reynolds Metals Co., FTC Dkt. 7009, CCH Trade Reg.Rep. Par. 28,533 (Decision of the Commission, 1959) (The test is called "a test," i. e., one of the tests.).

8. See Handler, Recent Antitrust Developments, 14 Record of the Association of the Bar of the City of New York 318, 326 (1959); Connelly, Emerging Theories of Mergers, 1960 CCH Antitrust Law Symposium 111, 113–115.

9. See DuPont-General Motors, supra note 7, 353 U.S. at page 593, 77 S.Ct. at page 877.

The Federal Trade Commission, in its opinions, often says that the proper inquiry is whether the products are "competitively distinct." See, e. g., Brillo Mfg. Co., supra, n. 7.

In United States v. Brown Shoe Co., supra, n. 6, the Court, confronted with various verbal formulations, defined the relevant market by observation of the practices in the industry. Apparently because it was fairly conclusive of the issue, the Court emphasized the evidence of interchangeability for use.

for including all abrasive products in the relevant line of commerce. The determinations as to the area of effective competition should have been made on the basis of all record facts delineating the relevant market or markets."

Inter-product competition has always been recognized where it has been found to exist in effective degree.[10] Where it is not found in effective degree, the products are not competing and, therefore, cannot be included in the same market.[11] Their failure to compete, one with the other, may be due to lack of suitability and interchangeability for the same uses, differences in characteristics and uses, or even because of psychological or other factors.

All commercial products compete for the consumers' spending, but this is not a meaningful area of effective competition for antitrust purposes. See the Supreme Court's discussion in the Cellophane case, United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377 at pages 394–395, 76 S.Ct. 994, 100 L.Ed. 1264. The various formulae may reflect a difference in judicial opinion as to the degree of competition between products which must be found to exist before they may be considered in the same line of commerce, i. e., before the probable or accomplished adverse effect upon that competition is to be condemned under the relevant antitrust statutes, or either of them. The question, which cannot be answered with precision or by a pat formula, is: How effective must be the competition in "the area of effective competition"? Evidentiary matters in addition to those stated above, include (1) degree of price sensitivity, (2) cross-elasticity of demand, (3) extent to which substitution occurs, (4) the manner in which the products are sold, and (5) the manner in which purchasers choose and buy. Statistical evidence can rarely, if ever, supply all the facts needed for a definitive judgment.

The Government asserts that "sufficient peculiar characteristics and uses" is the only proper test of "line of commerce" in a Section 7 case. The Government has asserted a number of respects in which feature films are alleged to have sufficient peculiar characteristics and uses to constitute them an appropriate line of commerce. These were enumerated in the Government's answers to interrogatories and were amplified at the trial. They are substantially as follows: feature films are considered by the television viewing public to represent a separate category of television entertainment; features were originally produced for theatrical exhibition and as such were particularly adaptable for programming segments of 90 minutes or longer; the cost of features per programming hour is generally considerably less than for other television programming material; features are shown more often in late evening hours; features enable television stations to maintain variety in their programming; features are particularly adaptable to spot participation sponsorship, i. e., sponsorship of the entire program by a number of advertisers whose commercials are interspersed during breaks in the showing of the feature films; and finally, features are readily identifiable as a separate and distinct product, and are treated as such by the

---

10. *Cellophane* (cellophane and other flexible packaging products); American Crystal Sugar (cane sugar and beet sugar); Brown Shoe Co. (shoes of different qualities, prices and design); all supra n. 6.

11. DuPont-General Motors (automotive and other fabrics and finishes); International Boxing Club (championship and other professional boxing); A. G. Spalding & Bros. Inc. (athletic equipment suitable for regular professional and amateur competition, and suitable only for children's play); Reynolds Metals Co. (florist foil and other aluminum foil); all supra n. 7. Also, Crown Zellerbach Corp., FTC Dkt. 6180, CCH Trade Reg. Rep. Par. 26,923 (Decision of the Commission, 1957) ("Census coarse paper," i. e., wrapping, bag and sack paper; and other "trade coarse paper" which also includes special industrial papers, sanitary and other tissue, and paperboard).

186

Federal Communications Commission, television stations, trade publications, newspapers and periodicals, and producers and distributors of television programming material, including the defendants.

During the course of the pretrial proceedings, the Government withdrew its contention that feature films are considered a separate and distinct product and are treated as such by the Federal Communications Commission. At the conclusion of the evidence upon the trial, Government counsel conceded during his summation that the Government failed to prove that features are particularly adaptable to spot commercials.

Plaintiff has failed to establish the remaining contentions. It called three witnesses, one each from stations WRCA-TV, WOR-TV and WCBS-TV in New York City. On direct and cross-examination these witnesses were asked about the details of plaintiff's specific contentions. They singularly failed to support the Government in any particular. On the contrary, these witnesses supported the contentions made by defendants.

William N. Davidson, Vice President and General Manager of WRCA and WRCA-TV, testified that WRCA-TV advertises feature films in the same manner as they advertise other types of television programming; that there is no particular group which wants to view features as opposed to any other group; that all television programming served the same programming function; that there is nothing unusual in the interchanging of various types of television programming material, and that live programming is competitive with feature films (44–45). WRCA-TV programs the Jack Paar Show every week night between 11:15 P.M. and 1:00 A.M. to compete with the WCBS-TV Late Show. The Jack Paar Show is taped at 8:15 to 10:00 o'clock four nights a week and run back at 11:15 to 1:00 A.M. the same night; and the fifth night is a rerun of a show which had been previously shown. Thus, the live programming can be presented later in the evening without the performers having to be present. Davidson stated that the same personnel are responsible for the purchasing and programming of all types of television programming material. It is thus apparent that Davidson did not establish any one of the contentions advanced by plaintiff.

Ivan Reiner, Television Program Manager for WOR-TV, testified that there is a considerable fluctuation in the use of features on his station from season to season and year to year, and a similar fluctuation in the use of all other types of programming. He stated that there is no distinction or difference between features and syndicated films, live programming, or other types of television programming on WOR. Reiner testified that, in his experience of seven years in the industry, "feature films in many instances were of higher cost than other types of programming depending upon the particular feature films involved." He further testified that he could operate without any feature films at all although he would like to have them. He further testified as follows:

"Q. Now, Mr. Reiner, in determining the type of program you are going to insert in your WOR-TV segment of the day, the fact is you take into consideration the composition of the prospective audience, the competing stations and what they are showing at the same time, and the possibilities of income potential from advertising? Those are the principal factors you take into consideration, are they not? A. And the cost and availability of the product.

"Q. And the cost and availability of the product? A. Yes.

"Q. Do you take all those facts into consideration for all types of programming on the air? A. That is correct.

"Q. Feature films, live programs, syndicated film, and all other types? A. Yes, sir."

None of Mr. Reiner's testimony supports plaintiff's contentions.

William C. Lacey, Manager of the Film Department of WCBS-TV, testified that the factors taken into consideration in purchasing feature films are the very same factors that are considered for all types of television programming and that all types are advertised by WCBS-TV in the same manner. He characterized the Jack Paar Show as a live program which competes with the WCBS-TV Late Show and that the live or taped show "Consult Doctor Brothers" and the show "The Thirteenth Hour" programmed on WRCA-TV compete with WCBS-TV's "Late Late Show."

With respect to late evening viewing, Lacey testified that, during a period of several weeks in 1956, WCBS-TV had a half hour syndicated film following the "Late Late Show" on Saturday night, and that "just recently we had approximately nine weeks of a syndicated show following the Late Late Show on Saturday nights". He remembered programming some "Superman" cartoons after the "Late Late Show" on Sunday night for about ten weeks.

Lacey also testified that there is a substantial variation in the extent and use of feature films and other types of television programming among the television stations in New York City; that there is no pattern to the use of features in New York; that some stations in New York use features a great deal and others hardly at all; that there is a substantial variation among different stations during the same year and by the same station from year to year in the proportionate use of feature films in various segments of the broadcast day compared to all features used during that day; and that there is a substantial variation in programming expenditures by stations for different types of television programming.

Lacey testified that there is a degree of experimentation in the television field; that Video-tape has already had a slight effect on programming and that it may have a greater effect eventually; that television stations in New York use non-feature programming at the same time other stations use features and vice versa; and that these stations continually substitute one form of programming for another.

It was Lacey's testimony that feature films are bought in the same manner that syndicated films are bought, and with the same type of terms and contracts; that there is a constant variation and fluctuation in the reaction of the audience to different kinds of television programming; that no one can tell dogmatically in advance how an audience is going to react to any type of program; that when the popularity of a program lessens, a station makes whatever changes are necessary; that there is no fixed, definite formula to apply to the television business; that there is no such thing as a definite time for live shows or a definite time for syndicated films or for feature films; that time segments on television are used in a large number of different ways; and that the whole system is characterized by variations, fluctuations and change.

Thus the very witnesses called by the plaintiff not only failed to support plaintiff's case, but gave persuasive testimony supporting the defendants' contention that there is an absence of any peculiar characteristic or use sufficient to constitute feature films a separate and distinct product.

The Government's own witnesses proved that there is a high degree of interchangeability between various types of television programming, thereby reflecting strong inter-product competition.

Plaintiff's documentary evidence likewise is insufficient to prove its case. Plaintiff's exhibits relating to the "line of commerce" issue are designed to show that defendants treat feature films differently from other forms of programming (Exs. G1, G17, G24, G43–52, G59); that feature films are treated as a separate and distinct product by trade publications and newspapers (Ex. G40–G42); that feature films are adaptable for programming after 11 P.M. (Exs. G90a, G90b, G90c); and that feature films gen-

erally cost less than syndicated film (G89).

The clear weight of the evidence rebuts the plaintiff's contentions. With respect to the Distribution Agreement, it obviously dealt only with feature films because that is the only type of television programming material which Universal had for licensing.

Moreover, the provisions which provide for parity of treatment for Universal feature films with other feature films being distributed by Screen Gems do not evince a recognition that feature films are not competitive with other types of television programming. In order to prevent discriminatory treatment, Universal had only to establish a point of reference for the purpose of determining whether the Universal feature films had been given equal treatment.

The same reasoning applies to the audit provisions mentioned by Government counsel (Sections XI.1 and XI.2). In any event, Section XI gives Universal the right to audit other programming sold by Screen Gems as well as feature films.

Exhibits G17, G24, G25, G43, G44, G45, G46, G47, G48, G50, G51, G52 and G59 reflect instances where Screen Gems considered feature films separately from other types of television programming material.

The distribution of feature films constitutes a significant part of Screen Gems' activities. It is to be expected that it should assess the performance of feature films sales separately and make comparisons with the results obtained with other products.

The fact that feature films are identifiable as such and are treated separately for certain purposes does not signify that they do not face the vigorous competition of other types of television programming material or that they have competitively distinct characteristics or uses.

Similarly, with respect to G40, G41 and G42, the fact that trade publications and newspapers might mention, discuss or list feature films separately does not throw light on how feature films are used by television stations or whether feature films face the competition of other types of television programming.

Defendants' countervailing documentary evidence persuasively refutes the alleged purpose of the Government exhibits. Defendants' exhibits D24–D36, D48 and D51 show that distributors, including Screen Gems, advertise feature films in the same manner as they advertise other TV programming and that the same promotional claims are made for all forms of TV programming. Exhibits D40 and D41 (constituting Screen Gems' promotion releases concerning the "Shock" and "Mystery Parade" packages) demonstrate that Screen Gems regarded feature films as competitive with other forms of TV programming.

The same point is illustrated by Exhibit D53, a memorandum from Ralph Cohn, deceased president of Screen Gems, to Abe Schneider, president of Columbia and Screen Gems. This memorandum, dated April 24, 1956 (long before the distribution agreement was entered into or this action commenced) and summarizing a top level meeting of the executives of Screen Gems and Columbia, reflects their thinking. They considered feature films to be simply part of the market for TV programming in general, and not a market by itself. Cohn stated that the greater availability of feature films to TV stations would affect the amount of network programming, former network programming and syndicated programming being offered to stations because of the "competition" of feature films. Taken in conjunction with the promotional material referred to above, exhibit D53 effectively answers the Government's contention that Screen Gems regards feature films as being sold in a separate market.

Any claim that the "trade" treats feature films differently from other forms of TV programming is put to final rest by Exhibit D47, the Film Manual for 1957–1958, published by the National Association of Broadcasters (NAB). This publication is designed to assist NAB member television stations in their operations.

It suggests that feature films should be treated like all other films and recommends that feature films should not ·be separated for purposes of station management. The NAB proposes that one individual have overall responsibility for film. Furthermore, the suggested accounting treatment and methods of exploiting film for advertising purposes are the same for feature films and other film. In addition, the NAB proposes a standard form of Motion Picture Exhibition Contract for Television which is designed to be used for feature films and all other film.

The Government included a small portion of this Film Manual as its exhibit G41. While the excerpt included in G41 actually supports defendants' position, it is clear from the Film Manual as a whole that the NAB recognizes features as no different from other film programming. This refutes the Government's contention that feature films are treated as a separate product.

Government's exhibits G90A–C show that feature films are not, in fact, used predominantly in the late evening to the exclusion of other types of television programming. Moreover, there is substantial oral and documentary evidence (to be discussed below) that feature films are not peculiarly adaptable for late evening showing or any particular time period.

Government's Exhibit G89, relating to cost, does not establish the fact that feature films cost less to TV stations than other types of television programming. Ward Ogden of Price, Waterhouse & Co., testified that the straight line method of amortization (which is the basis of the Government exhibit) should not be used. A correct method is used in Defendants' Exhibit D92, which shows that feature films do not cost less on the basis of Screen Gems' experience and an assumption of five runs per feature. It is reasonable to assume that five runs is a reasonable average in view of the fact that stations often do not use all of the number of runs granted; and there is record testimony that a film could be sold at approximately the amount that would be calculated for its next run, pursuant to "the sum of the digits" method of amortization.

Moreover, both G89 and D92 compare Screen Gems' features which are of lower quality with the Screen Gems' programming made especially for television, which is of at least equal quality to competitors' films. In any event, the Government contention as to cost, and its exhibit based on a faulty method of amortization, are directly contradicted by the overwhelming weight of oral testimony.

The testimonial evidence likewise supports defendants' case in every other respect. The trade witnesses established the fact that all forms of television programming serve the same purpose. Stations, as buyers of programming material seek to purchase entertainment of all kinds to attract viewers in order to enable stations to sell time to advertisers for commercial messages.

TV stations treat feature films and all other types of programming which they use for the same purpose identically. The same station personnel buy all types of programming and are responsible for all types of programming. Stations do not budget in advance for different types of programming. Stations advertise all of the components of their programming schedule in a similar manner in other media. All types of TV programming may be used repetitively. Stations take the same factors into consideration in the purchase of all types of TV programming material: cost, revenue potential, ratings, schedule balance and competitors' programming.

Because feature films and other types of television programming material are equally adaptable for the same use, it is not surprising that there is a substantial variation in the extent of the use of feature films and other types of programming material among television stations in New York City as well as throughout the country. Indeed, there is no pattern to the use of feature films by television stations. Some stations use them a great deal; others use them hardly at all; and, in at least one instance, never.

This lack of pattern is also illustrated by the fact that there is a substantial variation among different stations during the same year and by the same station from year to year, in the proportionate use of feature films compared to other forms of TV programming material and in the various time segments of the broadcast day when they are used.

This lack of pattern is also reflected in the substantial variation among different stations during the same year and by the same station from year to year, in the proportionate use of feature films in various segments of the broadcast day compared to all feature films used during the broadcast day.

The varying use by television stations of the various types of television programming material is manifested by the fact that there is a substantial variation —among different stations during the same year and within the same station from year to year—in the proportion of programming expenditures devoted to feature films, other films and live programming.

That all types of television programming material serve the same function of attracting an audience is vividly demonstrated by the circumstance that television stations use non-feature programming during time periods in which competing stations schedule feature films, and vice versa. Both features and non-features are shown at all periods of the broadcast day, are as adaptable to one time segment as another, including late evening viewing, and are not peculiarly necessary in any particular time period. Fred M. Thrower, vice president and general manager of WPIX, testified (757–758) that feature films are not particularly adaptable to any particular time slot and that there is no general pattern among television stations in their use of feature films:

"The Court: Is there any fixed time slot for feature films?

"The Witness: I am not aware of any. It would not appear from the use that is made of them across the country that there is because they are all over the schedules.

"The Court: Is there any general pattern among the TV stations in New York when feature films are generally shown or is that characterized by variations?

"The Witness: That is certainly characterized by variations.

"The Court: With regard to feature films compared to syndicated film or taped programs or other program material is there any time segment or time segments that are generally allocated for one type of program material but not for other types of program material?

"The Witness: Not consistently, no. * * *"

The evidence establishes that television stations continually substitute one form of programming for another.

Distributors of television films, including Screen Gems, regard feature films and all other forms of TV programming material as competitive.

The method of selling the various forms of TV programming material is similar, and they are often sold together.

Erwin H. Ezzes, vice president and general sales manager of Television Industries, Inc., a competitor of Screen Gems, testified (1814) that all television programming is competitive:

"A. May I elaborate on the answer to the previous question in which I stated that all programming is competitive?

"Q. Yes, go right ahead. A. All programming that fills or is used to fill a station's program day competes with what I have to sell because basically I sell programming and if there is no time for my programming I can't sell."

The foregoing direct evidence of interchangeable use refutes the Government's contention that feature films have peculiar characteristics and uses.

In addition, there is abundant evidence in the record which directly contradicts

the peculiar characteristics which the plaintiff claims exist.

The relative cost to stations of feature films and other TV programming material is roughly the same, although cost for all types varies over a wide range, depending on quality. Relative cost is such that changes can be made economically.

While the length of feature films is, generally speaking, somewhat longer than other programming, there is nothing peculiar to feature films in characteristic or use in that regard. A substantial number of feature films are programmed in time segments of 60 minutes. A substantial number of other types of programming are programmed in time segments of 60 minutes and 90 minutes. From the standpoint of a television station's programming, there is nothing significant or special in a time segment of 90 minutes.

The evidence indicates that there is a constant variation and fluctuation in the reaction of television viewers to the different types of programming. The quality and thematic content of all types of programming varies over a wide range, and stations do not require features to maintain programming variety. Television viewers regard feature films simply as entertainment, and there is no evidence that they have any preferences which might prevent feature films from being used interchangeably with other programming by television stations.

Furthermore, advertisers, advertising agencies and station representatives regard feature films as simply one type of entertainment for purposes of attracting viewers. Mr. Pellegrin, executive vice-president of H-R Television Inc. (stations representatives who sell the advertising time of stations throughout the country to advertisers, i. e., "time buyers") testified (1737–1738) as follows concerning the factors which are relevant to time buyers:

"Q. Can you give us the factors that the time buyer uses in deciding what is best for his client? A. The primary factor is the audience reached.

"Q. What do you mean by 'the audience reached'? A. The size of the audience and the cost of reaching the audience. It boils down to a factor that we call cost per thousand.

"Q. What is that? A. That is the cost of reaching a thousand viewers with its television message.

"Q. Is the agency concerned if one of the availabilities that you have given and the other representatives give are feature films or other forms of programming? A. Generally speaking, they are not.

"Q. Have you ever had a time buyer request your feature film availabilities? A. Not to my knowledge; I never have.

"Q. How many times per year do you get a request from time buyers for availabilities? A. Thousands of times per year."

The evidence convincingly shows that feature films are not more suitable than other types of TV programming material for the insertion of spot participation advertisements. Indeed, at the conclusion of the evidence, counsel for the plaintiff conceded during his summation that the plaintiff had failed to prove that features are particularly adaptable to spot commercials.

Government counsel argued that, if other types of television programming material are included in the same product market with feature films, it would follow logically that other types of entertainment, such as movies shown in motion picture theatres and radio, should also be included. This contention reflects a misunderstanding of the rationale of product market definition. The test is whether the products involved are competitive one with the other, or reasonably interchangeable for the same use; and the use involved in the case at bar is programming for television. The antitrust laws are ultimately directed toward protecting consumers. The consumers here involved are television stations.

In sum, the evidence establishes that feature films face a high degree of compe-

tition from other forms of television programming material; that they do not have peculiar characteristics or uses that are significant for television purposes; and that they are reasonably interchangeable with, and compete against, all other types of television programming material. The Court's conclusion is that there is no line of commerce or product market limited to feature films alone.

### Metropolitan New York is an Appropriate Section of the Country

The finding and conclusion that feature films do not represent a separate line of commerce is fatal to plaintiff's case under Section 7 of the Clayton Act. Hence it is unnecessary to determine whether metropolitan New York is an appropriate "section of the country" in which to test the effects of the acquisition.

Nevertheless, in the interest of a definitive disposition of that litigated issue, the Court will consider and pass upon it. The issue is a close one and not free from considerable doubt.

Plaintiff expressly limited its case to metropolitan New York and offers no proof to show competitive conditions in any broader geographical area.

Plaintiff and defendants are in agreement on the legal formulation embodied in the Senate Report accompanying the amendments to Clayton Act, § 7:

"Although it is, of course, impossible to define rigidly what constitutes a 'section of the country,' certain broad standards reflecting the general intent of Congress can be set forth to guide the Commission and the courts in their interpretation.

"What constitutes a section will vary with the nature of the product. Owing to the differences in the size and character of markets, it would be meaningless, from an economic point of view, to attempt to apply for all products a uniform definition of section, whether such a definition were based upon miles, population, income, or any other unit of measurement. A section which would be economically significant for a heavy, durable product, such as large machine tools, might well be meaningless for a light product, such as milk.

"As the Supreme Court stated in Standard Oil Co. v. U. S., (337 U.S. 293 [69 S.Ct. 1051, 93 L.Ed. 1371]), 'Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition.'

"In determining the area of effective competition for a given product, it will be necessary to decide what comprises an appreciable segment of the market. An appreciable segment of the market may not only be a segment which covers an appreciable segment of the trade, but it may also be a segment which is largely segregated from, independent of, or not affected by the trade in that product in other parts of the country." S.Rep. 1775, 81st Cong., 2d Sess., pp. 5–6 (1950).

■■■ Whether a geographic location is or is not an "area of effective competition" is clearly a question of fact in every case. The burden is on the proponent to demonstrate that the patterns of trade and commercial realities of the industry sufficiently demarcate a particular section of the country. American Crystal Sugar Co. v. Cuban-American Sugar Co., D.C.S.D.N.Y.1957, 152 F.Supp. 387, 398, affirmed 2 Cir., 1958, 259 F.2d 524.

The defendants' position and argument may be summarized as follows:

(1) It is undisputed that the signal coverage of the New York television stations embraces the New York metropolitan area and that there is a trade usage among people associated with television to refer to the signal coverage area of television stations as the "market". However, defendants assert, there is no proof that this trade usage coin-

cides with the phrase "area of effective competition."

(2) Defendants argue that the evidence tends to indicate the contrary, and that it is sufficient to rebut the Government's case with regard to this issue. Defendants point to the facts, established by the proofs, that television programming is sublicensed in metropolitan New York for use throughout the United States by sublicensees from all over the country; that metropolitan New York television stations are parts of various groups of stations under single ownership; that, in some instances, the ownership sublicenses programming for stations located outside metropolitan New York as well as for those inside; that a large segment of the total buying market for features and other television programming can be reached through a limited number of owners of multiple stations in widespread areas; that there are other organizations in metropolitan New York that buy television programming for stations throughout the country which are otherwise unaffiliated with other stations; and that the New York television stations are solicited by and obtain programming from distributors located outside the metropolitan New York area.

(3) The defendants call attention to the following established facts: Screen Gems and many other distributors of television programming are organized to distribute their product on a national basis. These distributors maintain sales offices throughout the United States. There is evidence that, in order to carry on business successfully, a distributor must sell on a national basis in order to recoup the cost of producing or otherwise obtaining programming; that the prices for advertising time on television stations in the various cities of the country, including metropolitan New York, are related to each other and do not move independently; that a large segment of the total advertisers on television can be reached through a limited number of national station representatives acting for television stations which are in widespread locations.

However, the evidence adduced by the plaintiff sustains its burden of proving that metropolitan New York is an appropriate section of the country. Not only feature films but all television programming material is sold in television markets. The Distribution Agreement provided for the preparation of schedules on the basis of "television markets" and such schedules were prepared. Screen Gems advertisements, sales campaigns, and sales analyses were on the basis of television markets, which Screen Gems considered to be "the market place where we do business, and it is that area that the station signal covers, that is the market place."

Screen Gems' regional sales offices were established on the basis of the number of television markets a salesman could cover effectively. All negotiations and completed sales for feature film exhibition rights were for exhibition within each station's market, with exclusive exhibition rights being granted to the particular station for its market. Competitive conditions varied from market to market.

Screen Gems also sells television programming material nationally, but it has made no national sales of feature films since 1956 and has discontinued serious efforts to sell feature films nationally. Other distributors of feature films have not been selling feature films nationally but rather advertise and sell feature films in television markets.

The metropolitan New York area is recognized and treated by Screen Gems in its distribution of feature films as a television market. Television trade publications regularly publish information for the New York television market. The New York television market is also referred to as the "New York Metropolitan Area" or "New York City, N. Y., and Newark, New Jersey"; and it is generally used in the television industry, its meaning without further definition being understood to consist of the area

served by the seven television stations having as their transmitter site the Empire State Building in New York City.

The seven New York television stations compete only with one another in the sale of television time for local advertising.

■ The Court concludes that the metropolitan New York City area is a "section of the country" within the meaning of the Clayton Act, § 7.

*There Is No Reasonable Probability of a Substantial Lessening of Competition*

The resolution of this issue is required only if the court is satisfied that it is established by a fair preponderance of the credible evidence that there has been an acquisition of an asset within the meaning of Section 7 of the Clayton Act, that the appropriate line of commerce is feature films, and that metropolitan New York is an appropriate section of the country.

The Government has insistently maintained that its proof on the issue of substantial lessening of competition will be limited to showing the anticompetitive effects of the Distribution Agreement on the business of distributing feature films in the metropolitan New York area. No proof was offered by the Government on any broader line of commerce. Thus, since the Court has found that the line of commerce is broader than feature films, the issue of a probability of a substantial lessening of competition, as such, need not be considered because, concededly, the Government's proof is insufficient.

Assuming *arguendo* that the Government has established that there has been an acquisition of an asset within the meaning of Section 7 of the Clayton Act (found by the court), that the appropriate line of commerce is feature films (not found by the court), and that

metropolitan New York is an appropriate section of the country (found by the court), the court will turn now to a consideration of the issue whether there is a reasonable probability of a substantial lessening of competition.

On this issue the Government's case is almost totally documentary. Although it called three trade witnesses in its own case, and had opportunity to cross-examine a number of trade witnesses called by defendants, the Government never attempted to establish so much as a suggestion of anticompetitive effects of the Distribution Agreement by oral testimony. Its case, therefore, on this issue is virtually limited to four exhibits, Exs. G67a, 68a, 69a and 70.

These exhibits are selected statistics. They do not present the full picture of whether there is any probability of a substantial lessening of competition. The weight to be given these exhibits must be determined in light of the fact that they attempt a yearly analysis when realistically, the nature of licensing television programming does not give significance to an annual base for statistics. Contracts for television programming extend over many years. The lumping of all license fees in the year a contract is entered into (G68a) or in the year when payments are made (G69a) is somewhat artificial in light of the number of library sales of great importance covering in one contract a very substantial number of feature films extending over a number of years.

In part, the problem is the familiar one of the appropriate measure of market share.

One cannot effectively use the number of units of product held as the sole measure of market share. Qualitative measures of the nature of competition in the market, in addition to a statistical measure of market share, must be taken into account.[12]

12. American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 1958, 259 F. 2d 524, 527; Brillo Mfg. Co., FTC Dkt. 6557, CCH Trade Reg.Rep. Par. 27,243 (decision of the Commission, 1958) (see

second consideration by the Commission, CCH Trade Reg.Rep. Par. 28,667 (1960).

It is stated in the House Report, H.R. Rep. No. 1191, 81st Cong. 1st Sess. p. 8 (1949) that the object of amended

Government's Exhibit 68a gives the value in dollars of contracts entered into with New York City stations by each of ten distributors in each of three years. It hardly measures the kind of competition that prevails, for the reason that the contracts are actually for supplies of feature films that might run over a period of years. Hence the substantial numbers by the largest distributors represent library sales of large numbers of feature films. In endeavoring to state a value for each year, the exhibit is misleading, in that it indicates sales in one year that have implications for other years.

The statistic of the value of the contracts entered into in any one year does not reliably reflect the economic power possessed by a distributor.

Government's Exhibit 69a overcomes, in part, the criticisms made of Exhibit G68a in the sense that yearly payments are a more reliable measure of economic power of a distributor in any one year. But Exhibit 69a is still subject to the criticism that these payments are, in part, for feature films that are used in other years. It is not a reliable index of the economic power of the individual distributor.

Government's Exhibit 67a indicates that, as of January 1, 1959, there were a total of 62 distributors of feature films who held a total of 9,127 titles. It gives, with respect to each distributor, the number of titles held as of that date. It deals with distributors whose addresses are given as ranging throughout the country.

The thrust of Exhibit G67a is that relatively large proportions of these titles are held in the hands of a few and that the share held by Screen Gems is a consequential share of the total product available. Exhibit G67a is one of the exhibits that fails to take into account a special characteristic of this industry: every unit of product that is sold as television programming has its own distinctive and unique qualities. A total of 931

titles is unevaluable unless one takes into account the relative value of those titles, the quality, the audience appeal that each possesses individually, and the number of times each may have been previously run. Some feature films, being of very high quality are each able to command a sublicense fee equal to the fee for a package consisting of a large number of run-of-the-mill feature films. On the other hand, some are of such poor quality that they cannot find a buyer at any reasonable price.

A further defect in Exhibit G68a is its failure to list the transfer of the RKO library to station WOR-TV in New York in 1956. The value of this library in New York was put at $5-7 million by Mr. Ezzes, who was intimately acquainted with the distribution business in New York and with the RKO library specifically. The impact of this deal—which is not reflected at all in the Government's exhibits—is still felt in the market place, for Mr. Reiner testified that his station has a substantial inventory of feature films, including 700 RKO's.

Exhibit G70 (which is a list of distributors and the number of saleable first run feature films they had available for exhibition in metropolitan New York as of January 1, 1959) is subject to the objection that it did not take into account the relative quality of the feature films involved. Exhibit D79 compares Screen Gems holdings of first run feature films as shown on Exhibit G70 with all first run feature films that are available. There are 3,989 pre-1948 feature films in this group, which included some feature films of apparently high quality, such as Goldwyn and Walt Disney films. While the quality of these films cannot be determined, there are a number which are of top quality; and the total accumulation of such feature films cannot be discounted in assessing competitive conditions in the market.

Exhibit D80 compares the sales of distributors in New York during the first six months of 1959 with the feature films

Section 7 is to prevent acquisitions the effect of which "may be a significant reduction in the *vigor* of competition." (Emphasis added.)

shown in Exhibit G70. Exhibit D80 shows that, during the first six months of 1959, Screen Gems sold significantly fewer feature films than three other distributors, and sold only as much as one other distributor. Thus, Exhibit D80 shows what Screen Gems is able to sell, rather than what it had on its shelves. This more meaningful test demonstrates that Screen Gems' economic power is less than that sought to be depicted by Exhibit G70.

Exhibit D81 shows that Screen Gems' share of the number of feature films sold in New York during the first six months of 1959 was less than 7 per cent, whereas Exhibit G70 states that Screen Gems held 39 per cent of the first run feature films. Screen Gems' share of the total dollar sales of feature films in New York for the same six months was less than 3 per cent, and the average price per feature film during this six months was only 42 per cent of the average price obtained for the sublicensing of the feature films by all distributors in New York. The foregoing percentages indicate the fallibility of a mere count of first run feature films held.

Exhibit D82 indicates that Screen Gems held, as of January 1, 1959, 558 saleable first run feature films that had not been licensed, and that of 260 feature films offered for sale in New York in 1959, only 77 were sold. This evidence also indicates a lesser degree of economic power than does Exhibit G70.

In other words, the Government's case on this issue ignores the types of information useful in determining whether the vigor of competition has been or will be impaired as a result of the Distribution Agreement. A substantial anticompetitive effect cannot be determined by simply showing Screen Gems' position in New York among some number of feature film distributors and its relative percentage of license fees contracted. Nor is the probability of a substantial anticompetitive effect shown by adding that Screen Gems presently possesses more unshown pre-August 1948 features than other active distributors.

Clayton Act, § 7 proscribes acquisitions which result in the reasonable probability of a substantial reduction in the vigor of competition within a relevant product market in a defined section of the country. Assuming arguendo that proper product and geographic markets have been defined and shown on a realistic basis, the question of the reasonable probability of a substantial lessening of competition must also be scrutinized realistically. Not all acquisitions are proscribed by Clayton Act, § 7. Acquisitions are proscribed only if they will probably result in a substantial anticompetitive effect.

The type of proof offered by the Government on this issue disregards or overlooks the following factors: competition afforded by other types of television programming (see preceding discussion of product market); the advent of Videotape; the economic strength of buyers; the extent of the need for feature films; the quality of feature films held by Screen Gems as compared with those held by others; the availability of new unshown feature films which will or may soon be available; the fact that the product being distributed is of a diminishing character; the circumstance that a high position in one year does not insure that this position will be maintained in future years (no large capital investment is necessary); and the imminent release to television of post-'48 feature films.

Statistics dealing with only rank and percentages do not by themselves suffice to describe whether the vigor of competition has been affected. There may be cases involving very large percentages in certain contexts from which one may infer the probability of a substantial anti-competitive effect. However, the case at bar does not present such circumstances.

The credible evidence fairly bears out the following essential facts, which must be considered on this issue:

All phases of the television industry have grown tremendously in the ten-year period 1949–1958. They have continued to grow since then.

Television stations have increased their strength spectacularly. The metropolitan New York television stations have large inventories of feature films and other TV programming material. They frequently repeat telecasts of the same film programming.

The volume of feature films and all other forms of film programming for television held by distributors and television stations has consistently increased from 1957 to 1959. During this time the amount of programming material available to the TV stations has pyramided, while the amount of television broadcast time has remained relatively stable. In other words, film programming material to a large extent remains in the market for re-run use and is constantly augmented by new production.

The foregoing economic factors increase the bargaining power of TV stations as buyers of filmed programming and diminish their desire to sublicense feature films unless they are of very high television quality. This fact is vividly stated (849–850) by Mr. Thrower, Station Manager of WPIX:

"Q. * * * Passing from the question of number of distributors or sellers to the number of properties or program material, has there been an increase? A. There has been a decided increase in three years, because I made a reference to producing Ford cars. They hoped to make six million cars a year. That means that in three years you have got eighteen million Fords that have not worn out. Well, it is the same in television. Every year each one of these outfits that sells, like Screen Gems and the others, that is in this field of distributing and syndicating films, make new properties for syndication, for network release, and with the limited place to go, the number of hours on television stations, obviously, they replace something. So whatever those new programs replace creates another program available to somebody else, like

the amount of film and taped material is increasing all the time.

"Q. Let me go at it another way. In the last three years has the number of broadcast hours, the number of hours on the air remained substantially the same for these seven TV stations? A. Yes, I would say that it has."

Mr. Thrower further explained (855) the effect that the availability of the many forms of television programming had on his desire to purchase features from Screen Gems:

"Q. What is it that you don't use feature films that are purchased from Screen Gems? A. Well, at the time that we may have decided to buy maybe somebody else (offered) something that was more desirable or had a better price. There could be so many reasons for that Judge. I would not answer.

"Q. You said that you wished you didn't have so many feature films on hand. Could you explain that for me, Mr. Thrower? A. Well, as I indicated we have been finding—I don't know how to put it —we have been finding that we can get along without features to a greater extent than ever before, because there is other material available, and we find that the other material attracts more viewers, more advertisers, which is what we are after."

The Government witness from WOR-TV, Mr. Reiner, also testified (103) that feature films are not necessary to his station.

An increasing source of television programming comes from the re-run product which is syndicated after it has been shown on the networks. Moreover, there are some pre-1948 features which have not yet been made available for television exhibition.

The cumulative effect of these economic factors is that today there is a buyers'

(i. e., TV stations') market. The circumstance that Screen Gems has not earned its estimated revenues is corroborative evidence of this fact.

In the face of this competition, it is significant that the Columbia and Universal feature films distributed by Screen Gems are generally of lesser value for television exhibition than the feature films being distributed by other distributors.

Furthermore, the Hygo feature films distributed by Screen Gems are worth far less for television exhibition than the feature films generally being distributed to television.

In addition, the revolutionary development of the Videotape recorder [13] has al-

13. See "Five Little Ampexes and How They Grew," Fortune (vol. LXI, No. 4) April 1960, pp. 116–120,· 165, 166.

"The television-recording technique illustrated here is the basis of Ampex's best-known product, the Videotape recorder, now used by all the major TV networks. (R.C.A.'s television tape recorder works on the same principle, with minor technical variations.) (118)

\* \* \* \* \*

"The recorder tape can be stored indefinitely, used as a master for recording duplicate tapes, or played back over and over again on any television recorder, whether made by Ampex or by R.C.A. (119)

\* \* \* \* \*

"Ampex engineers have shared the exhilarating experience of fathering a whole new industry. When Ampex took it up, magnetic tape recording was strictly for gadget lovers; today it is the basis of a billion-dollar branch of the electronics industry. In the current fiscal year, ending this month, Ampex estimates its sales at $65 million and after-tax earnings at $4 million. By fiscal 1962, barring some severe unforeseeable setback, sales will have gone over the $100-million mark, an achievement that can be fully savored by recalling that total billings as recently as 1950 were a mere $388,000. (120)

\* \* \* \* \*

"The Ampex Professional Products Co. produces the famous Videotape recorder for television, sound recorders for radio broadcasting, and master recorders for the phonograph-disk industry. (120)

\* \* \* \* \*

"Professional Products also makes Ampex's biggest money-maker, the Videotape recorder. Its introduction in April, 1956, touched off a revolution in television. Within a few days Ampex received· 100 orders for the machines, at $45,000 apiece.

"A year later, Videotape was reshaping network telecasting from coast-to-coast. It solved the problem of time-zone differences: a program can be put on at 8:00 P.M. in the East, recorded and replayed three hours later so Western audiences can see it at 8:00 P.M. their time. For plays and commercials, tape offers all the advantages of film—scenes can be reshot until they are perfect, fluffs can be edited out, studio space can be economized. Tape, furthermore, needs no processing and it offers much better reproduction than film. (165)

\* \* \* \* \*

"In 1957, Ampex and R.C.A. agreed to exchange licenses and information on each other's work. Both were anxious to avert the kind of conflict that had arisen when competing 33 rpm and 45 rpm long-playing records were simultaneously introduced by Columbia and Victor Records. Customers for television recorders had to be assured that tapes made on an Ampex machine could be played back on R.C.A. equipment, and vice versa. As a result of the agreement, the two recorders are compatible. In addition, Ampex got rights to the color recording process that R.C.A. was developing. This concession was to R.C.A.'s interest because it was anxious to promote color TV.

"R.C.A. put its first television recorders on the market early last year, and has delivered about forty since then. With its three-year advantage, Ampex has been able to rack up 603 sales to date, many of them to the networks. With the network market just about saturated, the real competitive battle will come in sales to individual TV stations. Only 189 out of 562 stations are now equipped with recorders. When more stations buy them, it is likely that the big program packagers, such as Desilu Productions, will switch from film to tape, thus opening up a large new market. R.C.A. believes it has an advantage with the stations and packagers because it offers a whole line of television studio equipment, including cameras, to go with its recorder. To overcome this handicap, Ampex last fall arranged to become the American distributor for the British-made Marconi

ready substantially affected, and will increasingly affect, the overall programming of television stations. The Videotape recorder is a process whereby sight and sound can be captured on magnetic tape and rebroadcast immediately. This permits stations in different time zones to make delayed telecasts at a different time than the original telecast. Moreover, through the use of Videotape, TV stations themselves can economically reproduce live programming which would heretofore have been lost forever for purposes of repetitive use, or, where quality merits, for syndicated sales to other stations.

It is noteworthy that Videotape has substantial advantages over film: tape is quicker to process; corrections can be made immediately; and it cannot be distinguished from a live presentation, whereas one can usually recognize a telecast from film.

Videotape is being used to record many TV programs. Some Videotaped television programs are and will be placed in distribution in competition with filmed programming.

Television stations thereby enter into competition with the existing distributors of television programming because the stations can and do produce live programming for exhibition and then recoup the cost of production by distributing the Videotape of the program to other television stations throughout the country.

Mr. Thrower commented on the pyramiding supply of programming and the production of syndicated programs on tape by stations in part as follows, in answering questions by the Court (852–54):

"Q. And does the supply of film, both syndicated and feature film, become an accumulating item? In oth-er words, as syndicated film is made and feature films are released from more and more sources, does that constantly replace old material or does it pyramid up the available supply? A. It pyramids up the available supply. Each year new syndicated film is made, each year new movies are made; eventually both find their way into television, and the re-runs also stay there; so the whole thing pyramids.

"Q. And as this supply of goods in the market increases, the TV stations, of course, can use more and more discrimination in deciding what is so bad that they would not want to show again and what it is they could show provided they had an attractive rate? A. Our position has been getting better on that score each year.

"Q. Whose position? A. Station managers.

"Q. Do you find there is greater opportunity for TV station program purchasers; they have more choice in a wider range as time goes on? A. Each year.

"Q. Isn't the competition as between the distributors of program material and the stations becoming more in favor of the TV stations as the available supply of material becomes larger? A. Well, the TV stations are beginning to compete with the suppliers that you have talked about in producing their own programming, as in the case of KTTV, who produces an hour divorce court program which is syndicated which we carry. So they have built a live show on their own, in their own studios for their own station and made tapes of it and they

four-and-a-half-inch image orthicon camera, and is now offering it along with the Videotape recorder.

"Still another new market developed last year when the National Educational Radio and Television Center in Ann Arbor, Michigan, received a Ford Foundation grant to equip educational television stations with recorders. The order—for forty-eight machines—went to Ampex, which thus scored a double coup. Not only did it secure a beachhead in educational television, but it came off the victor in its first direct competitive test with R.C.A." (166)

sell it to other stations. We do the same thing in our documentary programs. We make them available to other stations. Programs, material for television is coming in from more and more sources all the time."

In addition to the competition afforded by other types of television programming including Videotape, the number of distributors competing for the custom of the television stations is substantial; and entry into the business is easy. In 1957 there were 315 distributors of filmed television programming; in 1958 there were 330; and in 1959 there were 323. There were 62 new entrants in 1958; and 35 in 1959.

Similarly, in 1957 there were 115 distributors of feature films for television exhibition; in 1958 there were 111; and in 1959 there were 98. There were 19 new entrants in 1958; and 7 in 1959. Entry into the business of distributing feature films for television exhibition is relatively easy.

Small companies are able to sublicense programming in competition with large ones. This is evidently because the operation is primarily a selling one, and depends upon the product sold and the ability of the individual salesman rather than capital investment in physical plant and technological achievements.

Significantly, at least 5,279 feature films produced and released theatrically subsequent to August 1, 1948 have not yet been released for television exhibition. These post-August 1, 1948 feature films are generally more valuable than the pre-1948 films held by Screen Gems. When the post-August 1, 1948 feature films become available to distributors there will be a substantial and significant increase in the amount and quality of competition facing Screen Gems in the television distribution business. Indeed, the prospect that these films will come on the television market has already affected the ability of distributors to sell television programming.

The type of effect that the prospect of post-1948's is having on the market is illustrated by the testimony of Mr. Ezzes, an officer of a competitor of Screen Gems (1828–30).

Screen Gems has no right or understanding of any kind to distribute the post-August 1, 1948 feature films of Universal. Columbia has not yet made a decision with regard to the release to television of its post-1948 features.

However, it appears that the release of some of these post-1948 feature films is imminent since negotiations between the various unions and producers of motion pictures have been concluded, or nearly so, and the resulting contracts will embody provisions pursuant to which the producers may release pictures for television exhibition without threat of strike.[14]

14. The collective bargaining agreement between the Screen Actors Guild and the producers of motion pictures dated March 3, 1952, entitled "Producer-Screen Actors Guild Codified Basic Agreement of 1952" provided in effect as follows:

(1) The Guild made no claim for additional payment in respect of theatrical motion pictures released prior to August 1, 1948.

(2) The producers reserved the right to televise or license for televising any motion pictures produced originally for theatrical release, whenever released, without additional payments to the actors performing therein or to the Guild.

(3) However, the Guild reserved the right to cancel the codified basic agreement as to any producer-signatory who televised or licensed for televising any such motion pictures released after August 1, 1948, without first reaching agreement with the Guild for an additional payment to the actors or the Guild.

Substantially identical provisions were incorporated in the collective bargaining agreements between the producers and The Writers Guild of America, formerly The Screen Writers Guild, The Screen Directors Guild and the I.A.T.S.E., the International Alliance of Theatrical Stage Employees.

Similar provisions were incorporated in the collective bargaining agreement with the American Federation of Musicians, but said agreement has since expired in so far as Columbia Pictures Corporation and all other major producers are concerned and new agreements, without such provisions, entered into with a new un-

The threat of this strike had previously been an effective prohibition against the release of the post-1948 features for television exhibition.

Indeed, the prospect that these post-1948 feature films will come on the television market has already affected the ability of distributors to sell television programming.

From January 1956 through June 1959, Screen Gems accounted for 4.0% of the total programming expenditures by the metropolitan New York television stations, and 7.1% of their film expenditures. Screen Gems' share, excluding Universal features, of the expenditures by those stations for feature films has not been substantial and has declined since the making of the Agreement. The expenditures by those stations for Universal features do not constitute a substantial share of their expenditures for all programming, for all filmed programming or for feature film programming from July 1957 through June 1959.

The rank of Screen Gems as a distributor of feature films to the metropolitan New York television stations in the period 1956–1958 did not increase as a result of the distribution of Universal features. The Universal features have not permitted Screen Gems substantially to enlarge its share of sales of features to metropolitan New York stations; in effect, the Universal features have only enabled Screen Gems to replenish its source of programming to retain its previous share.

In terms of actual performance by Screen Gems, it is evident that, since August 2, 1957, it has become increasingly difficult for Screen Gems to sublicense its feature films to television stations in Metropolitan New York and in other cities. This is attributable to the economic strength of the buyers and to the present and increasing impact of the above-described competitive factors, including the expanding supply of programming material. Not only has Screen Gems made increasingly fewer sales, but those it has been able to make have been for smaller numbers of features, reflecting considerable "creaming" (sublicensing of the higher quality features in a package and rejection of the rest).

In Metropolitan New York, Screen Gems' experience has been that of 520 feature films contained in packages which have been not entirely sold, 287 (or 55.2%) remain unsold as of February 15, 1960. Of the 520 features, 203 were Universal features; and, of these, 129 (or 63.5%) were still not sublicensed as of February 15, 1960. This is true despite the fact that Screen Gems is and has been willing to sublicense many of these films or all of them together in Metropolitan New York for $1,500 per title, which is less than one-third of the average per title fee obtained on the sold films.

ion that has won recognition as the bargaining agent for musicians working in films.

The above referred to provisions of the Screen Actors Guild codified basic agreement of 1952 were retained unchanged in subsequent renewals of the agreement, as well as in renewals of the agreements with the Writers Guild of America and the Screen Directors Guild, until the expiration of the last Screen Actors Guild agreement early in March 1960, when the Screen Actors Guild demanded that any new agreement include provisions for the payment of additional sums of money to the actors or the Guild in respect of television exploitation of post-August 1, 1948 theatrical motion pictures, and went out on strike to enforce their demands.

The Writers Guild of America agreement expired January 31, 1960, and that Guild made similar demands, and also struck.

Agreement has recently been reached between the Screen Actors Guild and certain producers, including Columbia Pictures Corporation, with respect to the payment to be made with respect to television exploitation of post-August 1, 1948 theatrical motion pictures if and when same are released to television.

No agreement has yet been reached with the Writers Guild of America, the Screen Directors Guild, and the International Alliance of Theatrical Stage Employees.

Outside Metropolitan New York, Screen Gems has been unable to sell feature films in a substantial number of cities. This inability to sell has become progressively worse.

This direct evidence of the inability of Screen Gems to sell is graphically stated by Jerome Hyams, when he summarized the history of packages offered for sale in Metropolitan New York. He described (1416–1417) the intensive promotional campaign which launched the "Shock" package and made it successful. The "Shock" package was first offered to WCBS-TV, who refused it. Then it was offered and refused by WRCA-TV, WOR, and WPIX. Screen Gems finally succeeded in sublicensing the package involved to WABC-TV.

Mr. Hyams also described his efforts to sell the "Triple Crown" packages (1417–1419), the "Son of Shock" package (1419–1420), the package known as "Sweet 65" (1420–1421), and the packages known as "Powerhouse" and "Triumph" (1422–1423).

Mr. Hyams stated that in October 1959 an unnamed package of 78 features was released and remains unsold. He stated that efforts continue but that Screen Gems has been unable to sell the remaining features which are unsold in New York City.

Finally—as another indication of weak competitive position of Screen Gems subsequent to August 2, 1957—Mr. Ezzes, an officer of a competitor of Screen Gems, testified that the distribution of Screen Gems of the Universal features has had no effect on his ability to compete.

In addition to the above cited evidence showing that there has not been, nor will there be, a substantial lessening of competition, it is important to point out that, since October 1, 1959, Screen Gems has had *no* unreleased Columbia features and has remaining only 236 unreleased Universal features.

The diminishing competitive position of Screen Gems must also be viewed in light of the fact that a considerable proportion of the value of a given feature film is consumed by the first showing.

Thus, it is concluded that the competitive impact, if any, of Screen Gems' right to distribute the Universal features in combination with Columbia features is much less, now that all of the Columbia features and half of the Universal features have been offered for television exhibition. Indeed, Screen Gems' present ability to compete in the distribution of feature films is attributable to its stock of Universal feature films. It would otherwise have no salable stock of first-run feature films to distribute.

The distribution agreement and its operation did not result in the elimination of Universal as an actual or potential competitor of Columbia or of Screen Gems in the distribution of feature films for television exhibition. As previously shown, Universal did not itself engage in the business of distributing feature films for television exhibition at the time when the distribution agreement was entered into. Its corporate policy was to utilize independent and existing well-established distribution facilities. Had it not licensed its pre-1948 feature film library to Screen Gems, it would have licensed another. In any case, Universal itself would not have become a competitor of Screen Gems or Columbia. The net number of competitors in the distribution of feature films has not been reduced by Universal's entering into the distribution agreement.

The preponderance of the credible evidence leads to the conclusion that the distribution agreement has not had the effect of substantially lessening competition in the distribution of feature films or of other programming material; nor is there a reasonable probability that it may have such an effect.

Plaintiff has failed to sustain its burden of proof on the Clayton Act issues. The three TV station witnesses called by the Government actually supported defendants' view of those issues. The Government was thus left solely with a documentary case by which to prove complex issues of competitive conditions in a relatively immature and still unsettled industry. On the issue of the probability

of a substantial lessening of competition, the Government's entire case, consisting of only four exhibits, does not preponderate in probative value over the defendants' mass of credible oral testimony provided by business men intimately acquainted with the television industry.

### Conclusion

The Court concludes:

1. The Court has jurisdiction of the parties and of the subject matter.

2. Plaintiff has failed to prove that defendants violated Section 1 of the Sherman Act, because the preponderance of the credible evidence does not show:

(a) That the August 1957 distribution agreement or the actions of the parties pursuant to that agreement constitute an arrangement to fix prices; or

(b) That the defendants entered into the distribution agreement other than in order to meet the legitimate requirements of their respective businesses; or

(c) That the defendants had any purpose to fix prices of Universal or Columbia feature films or other television programming, or in any way to affect the general market price of feature films or other television programming; or

(d) That the distribution agreement itself, or defendants' operations thereunder, has affected the price for sublicensing the Universal or Columbia feature films or the other programming material distributed by Screen Gems, or the general market price of feature films or other television programming material; or

(e) That the challenged provisions of the distribution agreement were other than legitimate safeguards for Universal's interests and ancillary to the legitimate central purpose of the defendants in making the agreement.

3. Plaintiff has failed to prove that defendants violated Section 7 of the Clayton Act because the preponderance of the credible evidence does not show:

(a) That "the distribution and licensing of feature films for television exhibition" constitutes a "line of commerce"; or

(b) That there may be a substantial lessening of competition in any "line of commerce" in Metropolitan New York.

4. Defendants are entitled to judgment dismissing the complaint in its entirety on the merits.

5. The Clerk is hereby directed to make forthwith an entry of final judgment dismissing the complaint on the merits.

This opinion sets forth the findings of fact and conclusions of law (numbered and unnumbered) upon which the Court's decision and judgment are based.